LAURA E. FANNON (SBN 111500)
KELLY, HERLIHY & KLEIN LLP
44 Montgomery Street, Suite 2500
San Francisco, CA 94104-4798
Tel.: (415) 951-0535
Fax: (415) 391-7808

Attorneys for Defendants
HARTFORD LIFE AND ACCIDENT INSURANCE
COMPANY, LONG-TERM DISABILITY AND LIFE PLAN
FOR EMPLOYEES OF MINNESOTA METHANE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK A. EPPLER, | Case No.: C07-04696 WHA ADR |
| Plaintiff, | **DECLARATION OF LAURA E. FANNON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT/ ADJUDICATION RE EXHAUSTION OF ADMINISTRATIVE REMEDIES** |
| vs. | |
| HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY; LONG-TERM DISABILITY AND LIFE PLAN FOR EMPLOYEES OF MINNESOTA METHANE LLC, | Date: February 7, 2008<br>Time: 8:00 a.m.<br>Courtrooom: 9 |
| Defendants. | Hon. William H. Alsup |

Documents Attached:
1. Notice, Motion, and Memorandum;
2. Anderson Declaration;
3. Swanson Declaration;
4. Proposed Order.

DECLARATION OF LAURA E. FANNON IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT/ADJUDICATION RE EXHAUSTION OF ADMINISTRATIVE REMEDIES
CASE NO. C07-04696 WHA ADR

I, Laura E. Fannon, declare as follows:

1.       I am an attorney at law in good standing with the California State Bar and with the Bar of this Court.  I am Of Counsel to the law firm of Kelly, Herlihy & Klein LLP, attorneys of record for defendants in this action, Hartford Life and Accident Insurance Company ("The Hartford") and Long-Term Disability and Life Plan for Employees of Minnesota Methane LLC ("the Plan") (jointly, "defendants").  This declaration is submitted in support of defendants' motion for summary judgment or adjudication re: exhaustion of administrative remedies.  The following is based upon my personal knowledge of the facts stated herein and of the records maintained by Kelly, Herlihy & Klein LLP in the regular course of conducting its business.  If called as a witness, I could and would testify competently to the following facts.

2.       After the commencement of this litigation, I reviewed The Hartford's claim file and observed the notations in the file that no appeal had been received as of December 4, 2006, and that no correspondence from Mr. Baum except his October 3, 2006 letter (attached to the accompanying Anderson Declaration as Exhibit 2, Bates pages E162-63) had been received at any time before this lawsuit was served.  Accordingly, on November 5, 2007, I contacted the attorney of record for plaintiff Mark A. Eppler ("plaintiff") in this action, Julian Baum, Esq., and asked why he had not appealed.  Mr. Baum responded that he had appealed.  On November 20, 2007, Mr. Baum, through a contract attorney, forwarded to me a copy of a medical report dated July 7, 2007.  On November 27, 2007, Mr. Baum forwarded to me the cover letter dated August 2, 2007.  A true, correct, and complete copy of the July 7, 2007 medical report as forwarded to me by Mr. Baum's contract attorney is attached hereto as **Exhibit 3**.  A true, correct, and complete copy of the August 2, 2007 cover letter, addressed to The Hartford's Minneapolis Disability Claim Office, is attached hereto as **Exhibit 4.**

DECLARATION OF LAURA E. FANNON IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT/ADJUDICATION RE EXHAUSTION OF ADMINISTRATIVE REMEDIES
CASE NO. C07-04696 WHA ADR

1        3.    Thereafter, in the course of exchanging drafts of the Joint Case Management

2    Statement filed on December 13, 2007, Mr. Baum asserted for the first time that he had sent a

3    letter to The Hartford dated November 30, 2006. A true, correct, and complete copy of this

4    letter, as produced by plaintiff with his initial disclosures, is attached hereto as **Exhibit 5**. The

5    letter also bears the address of The Hartford's Minneapolis Disability Claim Office. As

6    discussed in the accompanying Swanson and Anderson declarations, this letter was never

7    received by The Hartford.

8        I declare under penalty of perjury under the laws of the State of California and of the

9    United States that the foregoing is true and correct. Executed this *3d* day of January, 2008, at

10   San Francisco, California.

11

12

13                           *Laura E. Fannon*

14                           LAURA E. FANNON

15

16

17   E:\27250\P06

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF LAURA E. FANNON IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT/ADJUDICATION RE EXHAUSTION OF ADMINISTRATIVE REMEDIES
CASE NO. C07-04696 WHA ADR

**EXHIBIT 3**

THOMAS B. LEWIS, M.D.

350 PARNASSUS AVENUE • SUITE 909 • SAN FRANCISCO, CALIFORNIA • 94117
PHONE 415-664-6929 • FAX 815-550-7887 • email tom@thomaslewis.com
WWW.THOMASLEWIS.COM

July 7, 2007

To:     Julian Baum
        Baum & Weems
        133 Peralta Ave
        Mill Valley, CA  94941

Re:     Mark Eppler
        Date of birth: 6/10/61
        1131 Oak leaf way, Stockton, CA 95289
        209-951-4810.
        Meppler@MSN.com.

Dear Mr. Baum:

    I have completed my examination Mr. Mark Eppler and my review of his medical records. In this preliminary report, I will review the history and the medical record briefly, as both are well known to you.

    I have been asked to answer the following question regarding Mr. Eppler:

    1.  Is Mr. Eppler unable to perform all the material and substantial duties of his regular occupation due to disease or illness?
    2.  Is Mr. Eppler malingering or otherwise feigning illness?

    In preparing this preliminary report, I have relied on the following sources of information:

    Clinical examination of Mr. Eppler: I met with Mr. Eppler for two hours, administered the Epworth Sleepiness Scale and the Goldberg Depression Scale, and performed a brief cognitive exam.

        Medical records, totaling 407 pages:
        Medical records from Stanford Hospital and Clinics
        Medical records from Paul A. Waters, M.D., internist
        Medical records from Ramin Manshadi, M.D, cardiologist
        Medical records from St. Joseph's Medical Center
        Medical records from John Connolly, M.D., sleep specialist
        Medical records from Jerry Crooks, M.D., orthopedist
        Medical records from Peter Gannon, M.D., neurologist
        Video record of surveillance performed by Hartford

<u>Personal communication:</u>
Conversation with Dr. Peter Gannon

<u>Relevant medical texts:</u> *Principles and Practice of Sleep Medicine*, Fourth Edition

## HISTORY of the PRESENT ILLNESS

Mr. Eppler is a 46 year old married man who developed treatment resistant obstructive sleep apnea (OSA) approximately eight years ago.

When he first developed OSA, his wife noticed that he had begun snoring loudly at night, accompanied by choking and gasping. He reports that he did not snore while in the Air Force, and his wife reports that he did not snore when they were first married. He himself noticed waking in the mornings with a dry mouth and a sore throat.

At that time, he was the chief financial officer at a bank. He reports that he gradually developed daytime lethargy, "like a zombie." He noticed having a slowed reaction time while he was driving. He would have to pull off the road and walk around the car in order to avoid falling asleep while driving to and from work. At times, he pulled off the road and slept in the car in order not to fall asleep while driving. He reports that this once happened when he was only 2 miles from his office, and he reports that he "absolutely could not make it" without sleeping. At one point, he drove into his own garage door due to slowed reaction time.

At work, he would have to take naps at his desk, and had difficulty getting things done.

In the medical records of Dr. Waters from 3/23/2001, he notes that Mr. Eppler described being fatigued, tired, and that he had nearly fallen asleep while driving to work.

Mr. Eppler was subsequently referred to John Connolly, M.D., a sleep specialist. Dr. Connolly referred Mr. Eppler for an overnight polysomnogram, or sleep study.

In a letter dated April 5, 2001 from Jon Connolly, M.D to Dr. Waters, Dr. Connolly reported his diagnostic impression, namely, severe obstructive sleep apnea. He describes the results of the polysomnogram that Mr. Eppler underwent in 3/2001, in which he had 163 obstructive apneic events and 215 hypopneas during the night. His apnea-hypopnea index (AHI) was 47. (AHI scores greater than 30 place a patient in the severe range.) Mr. Eppler had a blood oxygen saturation level below 90% for 35% of the night, with the lowest $O_2$ saturation extremely low, at 60%. Dr. Connolly recommended treatment with continuous positive airway pressure (CPAP).

Mr. Eppler began the CPAP treatment, and initially it was successful in reducing his daytime somnolence for about a year. After that, however, his symptoms of daytime lethargy, somnolence, and trouble concentrating recurred.

Mr. Eppler described himself as a "Type A workaholic." He reported that he would not have stopped working unless he was forced by external circumstance. When he originally had to

2

stop work, he said that his boss told him that he was "not the same guy" that they had hired. He was told that in meetings, he would repeat the same information over and over. He was told that the amount of work he was doing was steadily decreasing.

He himself had noticed that it took him an inordinately long time to write an e-mail. He noticed having difficulty sequencing things and that he had trouble making sense of things. He reported that he never used to be like that. He was used to being very competent and "on the ball," and eventually found himself unable to explain relatively simple financial matters.

In December of 2002, Mr. Eppler underwent a follow up polysomnogram, while on CPAP. This sleep study demonstrated substantial improvement in Mr. Eppler's OSA, with 8 apneic episodes, 9 hypopneic episodes, and an AHI of 3.7, which is within normal limits. His blood oxygen saturation was good, averaging 97%, with only ½ minute below 90%, and the lowest $O_2$ saturation 86%. These results demonstrate normalization of the Mr. Eppler's upper airway obstruction during sleep. The study, however, also showed reduced amounts Stage 3 and Stage 4 sleep, the deepest sleep stages. The study also showed substantially reduced amounts of REM sleep. The vast majority of Mr. Eppler's sleep time was spent in the lightest stages of sleep, which is not normal. He also evidenced 98 arousals during the night, which is markedly abnormal. Almost none of these arousals could be linked to apneic episodes. What this study reveals is that CPAP did eliminate Mr. Eppler's nocturnal respiratory obstruction, but it did not result in normalization of his sleep architecture. His sleep continued to be abnormally light and marked by very frequent interruptions of uncertain etiology.

Mr. Eppler continued to be significantly symptomatic with respect to daytime fatigue. Dr. Waters' notes from January of 2003 reveal ongoing complaints of fatigue, tiredness, and excessive daytime sleepiness. His notes from March of 2003 reveal that Mr. Eppler "still complaining of severe episodes of sleepiness."

In February of 2003, Mr. Eppler underwent an EEG, which was read by Dr. Gannon as being within normal limits.

In May of 2003, Dr. Gannon evaluated Mr. Eppler for his complaints of fatigue. At that time, Dr. Gannon noted that he was unable to find any neurologic etiology for Mr. Eppler's ongoing fatigue and drowsiness. Dr. Gannon recommended that Mr. Eppler be re-evaluated by a sleep specialist .

Dr. Connolly did re-evaluate Mr. Eppler, and on May 16, 2003, he wrote a letter to Dr. Waters summarizing his findings. Dr. Connolly notes that Mr. Eppler "has severe excessive daytime somnolence despite [being on CPAP]....His excessive daytime sleepiness is as severe as ever....A review of his last sleep study does show that even though the respiratory events were dramatically better on BiPAP, he still had multiple awakenings of unclear etiology....Clearly, he does have excessive daytime sleepiness, which may be due to multiple interruptions of his sleep of unclear etiology."

3

In his notes from June 17, 2003, Dr. Waters wrote that Mr. Eppler "continues to have episodes of hypersomnolence. Sleeps excessively and is unable to work at this time."

In August of 2003, Mr. Eppler underwent another polysomnogram, which again showed great improvement in his obstructive apnea, but the persistence of abnormally light and interrupted sleep. He demonstrated 2 obstructive apneas and 20 hypopneas, with an AHI of 3.3, which is within normal limits. His lowest $O_2$ saturation was 92%; his average $O_2$ saturation was 97%. However, he demonstrated no Stage 4 sleep whatsoever, and he evidenced 75 arousals during the night, which is markedly abnormal. The time it took Mr. Eppler to fall asleep at 4 separate times during the day, known as the multiple sleep latency test (MSLT), was also measured. (Short sleep latency times indicate that excessively high sleep drive is present during the day. ) Mr. Eppler's MSLT showed "evidence of excessive daytime sleepiness," with a time to daytime sleep onset as low as 30 seconds. His Epworth Sleepiness Scale (ESS) score was 22. (To place this is context, normal is 10 or less; the average score for a patient with narcolepsy is 18).

In his notes from August 21, 2003, Dr. Waters reports that Mr. Eppler "continues to have hypersomnia and falls asleep easily in spite of large doses of Adderall. He feels frustrated b/c he is not able to make it to his job in Roseville for fear of falling asleep while driving. On September 4, 2004, he noted that Mr. Eppler was "very frustrated because of his inability of his work because of hypersomnolence." In his notes of September 18, 2003, Dr. Waters wrote that Mr. Eppler "is still unable to work because of the somnolence." On October 30, he noted that Mr. Eppler "is still having episodes of excessive sleepiness and is unable to work and drive safely for any period of time because of excessive sleepiness."

Mr. Eppler was then referred to the Stanford Sleep Disorders Clinic, widely recognized as one of the best sleep centers in the world, for further evaluation.

In November of 2003, Dr. Guilleminault diagnosed Mr. Eppler as having mandibular dysfunction, which he felt might be contributing to Mr. Eppler's interrupted sleep, and his consequent fatigue and daytime somnolence. A spiral CT scan of chest was done to rule out thymoma, because Mr. Eppler's symptoms of fatigue and exhaustion were so severe they were felt to be possibly consistent with myasthenia gravis. No thymoma was found and myasthenia gravis was ruled out.

In May of 2004, a maxillomandibular advancement was performed at Stanford. Mr. Eppler says that he was told he was a good candidate for the maxillomandibular advancement surgery and that this procedure was necessary to treat his severe sleep apnea. He also reports that the surgery was the most painful experience he has endured. He was left with a number of undesirable residual effects from the surgery, including areas of numbness in the mouth and jaw, and nonalignment of his teeth.

In November of 2004, Mr. Eppler underwent a follow up sleep study to assess the efficacy of the maxillomandibular advancement procedure. Unfortunately, this sleep study revealed that the procedure did not improve Mr. Eppler's sleep as had been hoped. Instead, his sleep numbers were worse on this follow up study: He had 8 apneas and 53 hypopneas, and his AHI had risen to 10.7. Moreoever, Mr. Eppler demonstrated no Stage 3 or Stage 4 sleep whatsoever, and showed reduced

4

REM time. Almost all of his sleep time was spent in the lightest stages of sleep. He had 64 awakenings of the course of the night, which is highly abnormal.

In December of 2004, Mr. Eppler underwent an MRI of the head which was within normal limits.

However, he continued to experience great difficulty with concentration, attention. In his note of December 7, 2005, Dr. Waters reports that Mr. Eppler "continues to have periods of severe sleepiness and difficulty functioning. ...his wife is concerned that he is beginning to become more confused and concerned that he is losing his contact with reality. Tasks that he was easily able to accomplish in the past, he is finding very difficult to do. There is some concern about an early Alzheimer's type of process."

In a letter from Dr. Gannon to Dr. Waters on December 16, 2005, Dr. Gannon notes that "ongoing inadequately treated obstructive sleep apnea could cause at least some of these symptoms." Dr. Gannon repeated the EEG study, which was again within normal limits.

In a letter dated March 15, 2006, Dr. Waters wrote that Mr. Eppler "continues to have hypersomnia and the ability to sleep long periods of time, and has a difficult time waking up. ...it is very difficult for him to wake up in the mornings and he can fall asleep with great ease. This all takes place in spite of rather large doses of Adderall...Mr. Eppler's status has been essentially unchanged for the past several months. He continues to be unable to hold down any type of job and gainful employment because of his multiplicity of problems."

In a letter dated April 6, 2006, from Nurse Case Manager Jody Wilkins and employee of The Hartford, to Dr. Gannon, Dr. Crooks, and Dr. Waters, Ms. Wilkins wrote, "Mr. Eppler reports that he is unable to perform any gainful employment due to his inability to wake up or stay awake, focus, put together and complete thought processes, concentrate, and analyze and input data into a computer." She then described his ability, as revealed by covert surveillance video of the patient at his son's baseball game, to walk, bend, lift, carry, pull, climb, stand, sit, and reach. She reported that his sleep study results "show significant improvement from RDI 47 and min 02 sat 60% 3/2001 to RDI 10.7 and 02 Sat 85% in 11/2004." She further wrote that the etiology of his cognitive decline was unclear. She concluded with this following: "It is our belief that Mr. Eppler is not precluded from performing full-time sedentary to light work as long as he is provided the opportunity to change positions as needed. Please sign below if you agree or find no contraindication to this work capacity level." Dr. Waters deferred to the opinion of Dr. Gannon and Dr. Crooks and did not sign the letter; Dr. Crooks deferred to the opinion of Dr. Gannon and did not sign the letter; Dr. Gannon signed the letter, apparently indicating his agreement with the statement. Hartford subsequently discontinued Mr. Eppler's disability payments.

In his chart notes of May 18, 2006, Dr. Waters wrote, "They have discontinued it [Mr. Eppler's disability payments] on the basis of his ability to sit, stand, walk, etc., but, as the patient points out, the whole point of his disability revolves around the fact that he has hypersomnolence. He is unable to stay awake on the job for any period of time. He has experienced significant verbal impairment. He loses his chain of thought and is unable to carry on an ongoing conversation. This is

5

the major reason he is unable to work." Dr. Waters noted his intention to contact Hartford and request a reversal of discontinuation.

**Current status:**

     Mr. Eppler reports that he is always tired and sleepy. He has a hard time asleep onset now due to worry, although this is not usually been the case for him. He takes a very large dose of a wakefulness promoting agent, Adderall, 120 mg/d, and says that this allows him to be awake and functioning. Without the Adderall, he says, "I'm a zombie." He reports that he had a trial of Ritalin up to 180 mg per day, and that the Adderall is more effective. He did have a trial of Wellbutrin as well. (To place this in context, his Adderall dose of 120 mg and his Ritalin dose of 180 mg are the largest doses of these medications that I have ever seen prescribed.)

     He says that when he has things to worry about, he has trouble with sleep onset. Usually sleep onset is not a problem for him. He says he never feels refreshed in the morning. He says he never wakes before he is awakened by his wife. He estimates that left to his own devices, he would sleep until noon. When he gets up in the morning, he is groggy, and reports that it takes one to two hours before he is functional. His energy is poor, and he makes himself go out of the house because he wants to be around people.

     His wife reports that he is impossible to wake in the morning. For instance, in order to make the appointment today, she reports that she tried to wake him at 6 a.m., 7 a.m. and 8 a.m., and could not get him to wake up. He finally got out of bed around 9 a.m.

     He reports that he falls asleep at stoplights. Consequently he restricts his driving to 1 to 2 miles from home. He says that prior to the initiating therapy with CPAP, he would literally fall asleep at the wheel.

     He reports that his concentration is poor. He reports that his mood is not depressed, but that he is frustrated.

## PAST MEDICAL HISTORY

     **Vascular:** He reports having a deep venous thrombosis in his calf while in high school. He was hospitalized for two weeks, and was placed on Coumadin. At one point he was in the intensive care unit, and he says his parents were told there was some risk that he might die. He was discharged on Coumadin, but eventually developed hematuria, and the Coumadin was stopped. There was apparently no follow-up for this problem.

     In 1997 and 1998, Mr. Eppler suffered minor trauma to the forearm on two separate occasions, and on both occasions, these injuries resulted in traumatic swelling and a compartment syndrome, requiring surgical decompression. Dr. G. Andrew Macbeth, vascular surgeon, was consulted and he noted, "This is a very unusual clinical situation...he presents with recurrent episodes of traumatic swelling, requiring fasciotomies for fascial compartment syndrome. Eighteen months ago, the patient had a minor trauma to his left arm while swinging a golf club. He developed

6

severe swelling and resultant compartmental compression which required fasciotomies. This time he was admitted with minor trauma to the right arm and developed massive swelling and symptoms and findings consistent with compartmental syndrome....I suspect that this patient has underlying hypercoagulable syndrome." In April, 1998, Dr. Craig Bottka noted, "The etiology of his compartment syndromes after minor trauma remains unclear. He has been seen in consultation by Dr. Mehdi in hematology and Dr. Macbeth in vascular surgery. It was felt that he may have a hypercoaguable inherited condition that may predispose him to developing this type of problem. He underwent extensive laboratory testing to evaluate this. He also underwent venous Doppler studies of his proximal veins, but these failed to show any thrombosis."

**GI:** In July of 1998, an upper GI series revealed a large hiatus hernia. In August of 2006, Mr. Eppler was admitted to St. Joseph's Medical Center with diverticulitis. In November of 2006, an abdominal CT scan revealed a posterior esophageal mass, and colonoscopy revealed several polyps. In February of 2007, endoscopy revealed esophagitis and a hiatus hernia. He does have acid reflux disease, or GERD. He says that at one point he was diagnosed with inflammatory bowel disease, but that his current gastroenterologist does not see any evidence to support that diagnosis.

**Metabolic:** On several occasions, Mr. Eppler has been noted to have astronomically high triglyceride levels, as high as 2415. To place this in context, this is four times the highest value I have ever seen reported previously.

**Cardiac:** In January of 2002, Mr. Eppler was admitted St. Joseph's Medical Center for the evaluation of bilateral lower extremity edema. This workup was apparently inconclusive.

In October of 2002, Mr. Eppler saw cardiologist Ramin Manshadi, MD, for the evaluation of chest pain. He had a normal cardiac stress test. An echocardiogram showed mild prolapsed of the mitral valve and some associated regurgitation. A Holter study revealed rare pre-ventricular contractions, but was otherwise normal.

In June of 2003, Mr. Eppler was admitted to St. Joseph's Medical Center with substernal chest pain. His acetylcholine receptor antibody level was checked to rule out myasthenia gravis. A ventilation/perfusion scan was done to rule out pulmonary embolism. His protein C, protein S, antithrombin III, Factor V, and lupus anticoagulant were checked to rule out a hypercoagulable state.

**Orthopedic:** In August of 2004, Mr. Eppler developed multiple joint pains: right and then left shoulder pain, right hip pain, and low back pain. His right hip was found to have a stress fracture. MRIs of his shoulders are reported to have demonstrated degenerative joint disease, and an MRI of the lumbosacral spine done April 12, 2005, revealed L5-S1 disc herniation, and a small L4-L5 disc protrusion. Mr. Eppler was subsequently referred for rheumatology consultation for the evaluation of multi-joint inflammation. In August of 2005, Stanford rheumatologists Ariella Kelman, M.D. and Mark Genovese, M.D. conveyed their diagnostic impression to Dr. Guilleminault; the found "no evidence of systemic inflammatory autoimmune disease." Mr. Eppler was subsequently referred to orthopedist Gary Alegre, M.D. , who noted, "I believe the right sided disc herniation at L5-S1 is the source of his lumbar radiculopathy."

<u>Past Psychiatric History</u>

7

He has had panic attacks since 1991. His psychiatrist is Dr. Jerry Jones, and he has been seeing him since 1994. He was treated with Xanax for the treatment of his panic attacks well before he had the onset of sleep apnea. Prior to having sleep apnea, the Xanax did not make him sleepy during the day. Since developing sleep apnea and daytime somnolence, he has gone off the Xanax several times to see if that affects his daytime fatigue, but it has not.

His first panic attack was in a cafeteria. He felt tremulous, and felt an urge to flee the place. Prior to developing panic attacks, he had no prior history of anxiety. He went through flight engineer school without difficulty, and was good at staying calm in emergencies. He reports that he did used to be extremely shy when he was a child. He denies having any phobias. He denies being a worrier, saying that he analyzes things from every angle, but does not have excessive worry.

Medications

Adderall 30 mg four times daily; Nexium 40 mg twice daily; Norvasc 5 mg/day; Lexapro 20 mg per day; Xanax 1 mg four times daily. He reports that he is currently not taking any medication for his elevated triglyceride levels. He says, the last time this was checked with some time ago.

Allergies

He has no known drug allergies.

Family History

He has no family history of mood disorder. A cousin of his father's also had panic attacks. Other than this, there is no family history of psychiatric disorder.

Personal and Social History

Mr. Eppler was in the Air Force for five years, as a flight engineer. He enjoyed that job. He graduated *magna cum laude* from California State University, Sacramento. He has a business background with emphasis in finance. Two years out of college, he worked for the FDIC, auditing banks. He left the FDIC when his wife's mother was diagnosed with cancer, in order to reduce the amount of travel that he had to do. He then took a job as the CFO at a bank, and also served on the bank's board. He wanted to work on getting an MBA, but had no time to do so at that job.

## CLINICAL EXAMINATION

Mr. Eppler was a man in middle age, accompanied by his wife. He arrived one hour late for the appointment, because he got the address mixed up and went to the wrong address. He was a man of stocky build, with a short, thick neck and very large forearms. He was casually dressed. He was pleasant and cooperative with the interview process.

His speech had a normal tone, and was somewhat slow. His motor exam was within normal limits. His affect was mildly frustrated, and was neither depressive nor anxious. His mood was "frustrated." His thought process was slow, with a definite tendency to wander off the topic of discussion. There was no evidence of a formal thought disorder His thought content revealed no auditory or visual hallucinations, no suicidal or homicidal ideation. Judgment and insight were fair.

His cognition was notable for apparent distractibility. At several points in the interview, he appeared to have lost the thread of the discussion and had to be re-oriented to the topic. At another

8

point in the interview, he re-told a story that he had told previously in the interview, apparently without realizing he was repeating himself.

On a brief cognitive exam, he was correctly oriented to the year, day of the week, month, but could not give the date. He was correctly oriented to location. He could repeat four objects back immediately without difficulty. He could recite the days of the week in reverse order, but was notably slow at doing so. He could recite the months of the year backwards, but was again notably slow in doing so. He was able to recall three of four objects after an interval of 5 minutes. He recalled the fourth after a prompt. When asked to count from 1 to 10 out loud as fast as he could, he was notably slow. His ability to abstract was unimpaired. His language skills were unimpaired, in that he could name, repeat, and comprehend without difficulty. His ability to copy a modestly complex shape was impaired. During much of his cognitive exam, there were long pauses and long latencies to response.

His Epworth Sleepiness Scale score was 23, which is elevated.

On the Goldberg Depression Scale, the patient endorsed items regarding attention and executive function, rating the following as "quite true": "I think slowly"; "It is hard for me to concentrate on reading"; "I have difficulty making decisions" and "It takes great effort for me to do simple things." He did not endorse mood relevant items, such as "My future seems hopeless," or "I feel sad, blue and unhappy."

His blood pressure was 125/74, with a heart rate of 76.

## CONCLUSION

Synopsis: Mr. Eppler's medical situation, while gravely unfortunate, is relatively straightforward. He is a 46 year old man who developed severe obstructive sleep apnea. He was treated with CPAP, which successfully eliminated his nocturnal airway obstruction but failed normalize his sleep. He continued to demonstrate abnormally light sleep, with substantial reductions in the time spent in deep sleep stages and many nocturnal arousals and awakenings. Because his sleep remained substantially light and interrupted, he continued to demonstrate considerable daytime somnolence, trouble with attention and executive function. Nurse Case Manager Wilkins did not correctly interpret the significance of Mr. Eppler's sleep studies. She was apparently under the impression that improvement in the AHI must be followed by improvement in daytime somnolence, and that therefore Mr. Eppler "shouldn't" be symptomatic in the presence of an improved AHI. This assumption is incorrect in at least two respects 1. CPAP commonly improves obstruction *without* large reductions in daytime somnolence. 2. Although his AHI normalized (at one point), *Mr. Eppler's sleep did not,* and he continued to demonstrate very significant abnormalities on his polysomnograms that are consistent with his subjective complaints. Video surveillance demonstrated that Mr. Eppler can move without great limitation, a finding of limited interest at best, since it is entirely irrelevant to the issue that is the basis of Mr. Eppler's disability, namely, his abnormal sleep and his consequent daytime symptoms. Dr. Gannon then signed a pre-written statement saying that Mr. Eppler could perform light activity. Hartford apparently interpreted this event to indicate that Mr. Eppler had no disabling medical condition of any kind. Dr. Gannon, however, reports that he was speaking only to the patient's physical limitations, and that he himself did not test the patient for

9

and would not have been able to render an opinion on any disability arising from Mr. Eppler's abnormal sleep or his cognitive status.

Based on my review of the above materials, my clinical examination of Mr. Eppler, my conversation with Dr. Gannon, and my own training and experience, it is my professional opinion that Mr. Eppler is unable to perform all the material and substantial duties of his regular occupation due to excessive daytime somnolence and cognitive impairment that are likely the result of abnormal sleep.

I will expand the above points briefly.

First, it is clear that Mr. Eppler has been unable to perform his regular occupational duties. His ability to perform work or work-like tasks has been severely impaired by his fatigue, daytime somnolence, and cognitive difficulties, including difficulty with concentration and executive function.

That Mr. Eppler developed severe OSA is incontrovertible. His symptoms, including morning dry mouth, sore throat, loud snoring accompanied by gasping, impaired daytime alertness, difficulty with concentration and cognition, match precisely those seen in patients with OSA. Moreover, his polysomnogram of March 2001 clearly demonstrated not only that he had OSA, but that he had quite severe OSA, with O2 desaturation into the 60%s, 163 apneic episodes, 215 hypopneas, and an AHI of 47. It is worth pointing out that much of the morbidity of OSA comes from the fact that airway obstruction and under-ventilation cause *arousals from sleep*: the brain receives information that inadequate ventilation is taking place, and the brain then interrupts the sleep cycle with an arousal in order to enable a deep breath. If this cycle happens repeatedly during the night, then deep sleep for a sufficient length of continuous time is not achieved, and the sleep drive is not satisfied. This results in pathological *daytime* activation of the brain centers that produce sleep, because the brain is trying to catch up on the sleep that it missed the night before. These "sleep-on" centers, when activated during the day, necessarily *decrease* the functioning of the higher brain areas responsible for consciousness, attention and cognition, just as they do when we fall asleep at night and cognition ceases. If the "sleep-on" centers are fully activated during the day, the patient falls asleep. If the "sleep-on" centers are partially activated during the day, the patient experiences impaired cognition, because the activity of his cognitive centers is being suppressed.

Mr. Eppler's OSA was treated with CPAP. CPAP works by keeping the airway open at night by blowing a continuous stream of pressurized air from the mouth and nose, down the airway. The idea behind CPAP is that if airway obstruction can be prevented, then the patient can breathe normally during sleep, and the brain will not "waken" from sleep repeatedly in order to force deep inspiratory efforts. Mr. Eppler's CPAP treatment clearly normalized his airway obstruction during sleep, as can be seen by his follow up sleep study after beginning CPAP: his AHI dropped into the normal range, indicating normal breathing during sleep.

Mr. Eppler, however, continued to be acutely symptomatic with daytime fatigue, somnolence, and impaired cognition. We can easily see why by looking at the results of his polysomnograms that post-date his CPAP treatment: while his AHI is greatly improved, he *continues to demonstrate a very high number of arousals from sleep*. Sleep arousals, and not airway obstruction *per se*,

are the direct cause of daytime morbidity in OSA. This turn of events is decidedly unfortunate for Mr. Eppler, but it is in no way surprising. CPAP very commonly produces significant reductions in airway obstruction and desaturation, while resulting in minimal improvements in daytime symptoms such as fatigue, somnolence, and cognitive impairment. The reasons why this should be so are not well understood. Some investigators have proposed that the CPAP apparatus itself, while providing great benefit to airway obstruction, constitutes a significantly arousing stimulus that interferes with sleep. Anyone who has worn the apparatus for any length of time will not find this hypothesis far-fetched. Other investigators have proposed that sleep apnea and repeated O2 desaturations may in some way permanently damage the neural hardware that produces wakefulness and cortical activation. While we do not know exactly why many patients show improvement in the AHI that is not matched by improvement in their daytime symptoms, this is clearly the case. This clinical problem is so common, in fact, that the Food and Drug Administration has approved a pharmacologic agent for exactly this indication: for the treatment of excessive daytime somnolence that remains in OSA patients *after* they are treated with CPAP. (That agent is modafinil, or Provigil ®)

This is the precisely the opinion expressed by sleep specialist John Connolly, M.D., who in his letter of May 16, 2003 of wrote, "A review of his last sleep study does show that even though the respiratory events were dramatically better on BiPAP, he still had multiple awakenings of unclear etiology….Clearly, he does have excessive daytime sleepiness, which may be due to multiple interruptions of his sleep of unclear etiology."

When Nurse Case Manager Wilkins wrote to Drs. Waters, Crooks, and Gannon that Mr. Eppler's AHI showed great improvement and asked them to sign a statement attesting to the fact that he could perform work, the clear implication of her letter was that Mr. Eppler's AHI results meant that his ongoing daytime symptoms could not, therefore, be attributed to his OSA. This conclusion is simply incorrect. The most charitable way to interpret this conclusion is that it betrays a lack of understanding about the pathophysiology of OSA, a lack of familiarity with the scientific and medical literature on the subject, and a lack of familiarity with the opinions of Mr. Eppler's own physicians.

Drs. Waters, Crooks, and Gannon were also provided with a record of the video surveillance of Mr. Eppler. I have reviewed this video record myself. There can be no doubt that the video clearly shows Mr. Eppler walking, bending, lifting, carrying, pulling, climbing, standing, sitting, and reaching. He does so an apparently leisurely and unhurried pace. This video record is, however, wholly immaterial to the fact of Mr. Eppler's disability, just as Dr. Waters opined in his chart note of May, 2006. Mr. Eppler's symptoms of daytime fatigue, somnolence, and cognitive impairment are, in my opinion, caused by abnormal sleep. I must confess I can detect no logical connection between this state of affairs and his ability to bend or reach.

No speculation is necessary as to what Dr. Gannon meant when he signed the letter from Nurse Case Manager Wilkins saying that Mr. Eppler could perform light work. When I spoke with Dr. Gannon, he was unambiguous in stating that his endorsement of the pre-written statement pertained only to Mr. Eppler's physical ability to perform activity, that he had not assessed and would not have been able to comment on the status of Mr. Eppler's cognitive function. The fact

11

that Dr. Gannon signed the letter from Hartford does not, therefore, constitute any evidence whatsoever about Mr. Eppler's sleep or daytime fatigue, somnolence, and cognitive impairment.

The suggestion made by Hartford that Mr. Eppler is malingering is contradicted by all the evidence available to me. Mr. Eppler had a high-paying job that he enjoyed. After developing OSA, he sought medical opinions and treatment from a number of physicians, including: Paul Waters, M.D., family practitioner; Peter Gannon, M.D., neurologist; John Connolly, M.D., sleep specialist; Christian Guilleminault , M.D., Ph.D., Associate Director, Stanford Sleep Disorders Clinic. Not a single one of these physicians has ever expressed in the medical records any doubt that Mr. Eppler has a real disorder. To the contrary, all of them recommended further diagnostic procedures and/or medical interventions. He underwent a number of diagnostic procedures, including two EEGs, an MRI of the head, at CT scan of the chest, and several overnight polysomnograms. The results of those polysomnograms are unanimous: none were normal, and all of them have demonstrated abnormalities that could very plausibly produce the very symptoms that Mr. Eppler demonstrates. Mr. Eppler underwent a major surgical procedure to his face and jaw, which resulted in considerable pain and some long-lasting undesirable residual effects. He has undergone number of medication trials at very high doses. The issue of whether or not Mr. Eppler is actually excessively somnolent during the day is not even debatable, since that very fact was assessed in the Multiple Sleep Latencies Test (MSLT) of August 2003, in which he was found to fall asleep during the day in as little as 30 seconds. These facts suggest to me that Mr. Eppler has a real abnormality of sleep, demonstrable on polysomnogram; this abnormality produces the symptoms we might expect it to produce, as evidenced by his remarkably short MSLT; and that he has gone to considerable lengths to try to alleviate or eliminate this problem. The fact that he remains significantly symptomatic is sad and difficult to accept, but it certainly cannot be attributed to a lack of effort on his part to fix the problem.

In summary, I conclude that Mr. Eppler is disabled by fatigue, daytime somnolence, and cognitive impairment that are the direct result of treatment-resistant and severe obstructive sleep apnea. I can find no credible or logically coherent evidence to suggest that he is malingering.

Please do not hesitate to contact me should you have any questions regarding Mr. Eppler.

Sincerely,

Thomas B. Lewis, M.D.

Diplomate, American Board of Psychiatry and Neurology
Assistant Clinical Professor
University of California, San Francisco
School of Medicine

12

In a letter dated April 28, 2006, from The Hartford to Mark Eppler, The Hartford reports Mr. Eppler's report of his symptoms, as follows "excessive daytime sleepiness resulting in constant fatigue, inability to concentrate, focus, drive long distances, difficulty making decisions, poor memory recall, forgetfulness, extreme headaches." The letter went on to review video surveillance, saying "You were observed walking at a brisk pace...carrying...pulling...sitting...reaching. Your observed activities were inconsistent with your reports that you experience excessive daytime sleepiness resulting in constant fatigue, inability to concentrate or focus."

3/1/2006 Interview with Hartford investigator James Budkus. Eppler "the disabling medical conditions that currently prevent me from returning to work are cannot stay awake, cannot focus. Unable to put together my thoughts and stay focused on tasks on hand. I cannot complete the thought process. My symptoms include inability to wake up, headaches and burning sensation in my brain, inability to focus and concentrate, inability to drive any distances, having difficulty getting going." Reported to be "lethargic, appeared to have heavy eyes, did lose [] train of thought and requested that investigator repeat the question that was asked." .

13

**EXHIBIT 4**

LAW OFFICES OF
# B A U M  &  W E E M S
9 Tenaya Lane
Novato, California 94947
Writer's Direct Telephone (415) 892-3152
Writer's Direct Fax: (415) 892-3096

August 2, 2007

The Hartford
Benefit Management Services
Minneapolis Disability Claim Office
3800 American Blvd. W., Ste 600
Bloomington, MN 55431

Re:     Claimant:          Mark A. Eppler
        Policy Holder:      Minnesota Methane LLC
        Policy Number       GLT302812

Dear Sir or Madam:

Enclosed is a copy of a preliminary report by Thomas B. Lewis, M.D., who has examined Mr. Eppler and reviewed his medical records at my request.

I believe that with Dr. Lewis' report, The Hartford should now have sufficient medical information to approve payment of Mr. Eppler's benefits. If The Hartford disagrees, I respectfully request once again that The Hartford explain its disagreement, and inform me of any additional information or documentation which it believes is necessary to perfect Mr. Eppler's claim.

Very truly yours,

Julian M. Baum

**EXHIBIT 5**

LAW OFFICES OF
# BAUM & WEEMS
9 Tenaya Lane
Novato, California 94947
Writer's Direct Telephone (415) 892-3152
Writer's Direct Fax: (415) 892-3096

November 30, 2006



The Hartford
Benefit Management Services
Minneapolis Disability Claim Office
3800 American Blvd. W., Ste 600
Bloomington, MN 55431

Re:        Claimant:          Mark A. Eppler
           Policy Holder:     Minnesota Methane LLC
           Policy Number      GLT302812

Dear Sir or Madam:

Thank you for your letter dated October 23, 2006, enclosing some, but not all of the documents and information requested in my letter dated October 4, 2006.

In order to permit Mr. Eppler to respond adequately to The Hartford's decision, we respectfully request once again that you provide to us the following documents and information:

- A complete copy of The Hartford's claim file pertaining to Mr. Eppler;

- A complete copy of all other documentation (whether maintained in hard copy or computer medium) pertaining to or referring to Mr. Eppler's disability claim, whether or not it is deemed to be part of the "claim file;"

- a copy of all internal rules, guidelines, protocols, or other similar criteria which were relied upon in the decision to terminate Mr. Eppler's disability benefits;

- A copy of the curriculum vitae of each health care professional whose advice was obtained, in connection with Mr. Eppler's disability insurance claim, without regard to whether the advice was relied upon in making decisions regarding the claim;

- Each document which was submitted, considered, or generated in the course of making the decision to terminate Mr. Eppler's disability benefits, without regard to whether they were relied upon in the decision to terminate his disability benefits, including but not limited to The Hartford's claims manual(s);

- All documents which constitute a statement of policy or guidance with respect to claim determinations for claimants diagnosed with medical conditions such as Mr. Eppler's, without regard to whether such documents were relied upon in making the determination to terminate Mr. Eppler's disability benefits;

The Hartford                                                                                        Page 2 of 2
November 30, 2006

- All documents which demonstrate The Hartford's processes and safeguards designed to ensure and to verify that disability benefit claims determinations are made in accordance with the terms of the Summary Plan Description for Mr. Eppler's disability insurance coverage, and that those terms have been applied consistently with respect to similarly situated claimants;

- Copies of the Summary Plan Description(s) applicable to Mr. Eppler's disability benefits claim;

- Copies of the insurance policy and the Certificate(s) of Insurance applicable to Mr. Eppler's disability benefits claim; and

- If any documents specified above are withheld or do not exist, a list of each document and a complete explanation of the basis upon which each document is being withheld.

We also respectfully request that you inform us of any particular additional information or records which you consider necessary to perfect Mr. Eppler's claim for benefits.

Once we have all of the requested documentation and information, we intend to have them reviewed by Mr. Eppler's physicians and/or an independent physician for evaluation and response.

We thank you in advance for your consideration and assistance. Please do not hesitate to contact us with any questions or concerns you may have, or to discuss Mr. Eppler's benefits claim.

Very truly yours,

Julian M. Baum

COPY