1  JULIAN M. BAUM (CA State Bar No. 130892)
2  THOMAS J. FUCHS
   BAUM & WEEMS
3  9 Tenaya Lane
   Novato, California 94947
4  Telephone: (415) 892-3152
   Facsimile: (415) 892-3096
5

6  Attorneys for Plaintiff
   MARK A. EPPLER
7

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK A. EPPLER, an individual, | Case No. C07-04696 WHA |
| Plaintiff, | |
| v. | PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/ADJUDICATION |
| HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY; LONG TERM DISABILITY AND LIFE PLAN FOR EMPLOYEES OF MINNESOTA METHANE LLC, | Date: August 7, 2008<br>Time: 8:00 a.m.<br>Courtroom: Hon. William H. Alsup<br>United States District Judge |
| Defendants. | |

## I. INTRODUCTION

Plaintiff Mark A. Eppler suffers from an unusual form of obstructive sleep apnea, which has not responded to medication or even major surgery. The result, as confirmed by his physicians and the Stanford Sleep Disorders Clinic, is that Mr. Eppler is unable to achieve so-called "restorative" sleep, and suffers symptoms similar to prisoners who are forced to undergo extended sleep deprivation: cognitive dysfunction, inability to concentrate or focus, difficulty in making decisions, poor basic memory recall, and serious headaches. He is able to maintain a certain, impaired state of wakefulness and function by taking (among other things) an extraordinarily high dose of powerful psychoactive drugs.

On or about October 30, 2003 Mr. Eppler left work at Minnesota Methane. He received disability benefits starting April 29, 2004, based on his inability to perform the duties of his own occupation. Prior to his illness, plaintiff Mark Eppler was the Controller for Minnesota Methane LLC. Mr. Eppler has a degree in Business Administration and finance from California State University, Sacramento, and served in the United States Air Force for approximately six years as a flight engineer.

Defendants paid long-term disability benefits to Mr. Eppler from April, 2004 to April, 2006. They terminated payment of his benefits by letter dated April 28, 2006. By letter of October 3, 2006, plaintiff notified defendants that he wished to appeal the termination of his benefits.

## II. FACTS

### A. Plaintiff

Plaintiff Mark Eppler, now 47 years old, is a married father of two children, and resides in Stockton, California. E074; E535.[1] He was employed by Minnesota Methane, LLC as its company Controller from May 16, 2001 to October 23, 2003. E488-489. Prior to his employment with Minnesota Methane, he was the Chief Financial Officer of Fineline Industries

---

[1] References to "E _" and "EA __" are to the bates-stamped documents submitted to the Court by defendants in support of their Motion, and represented by defendants to be the complete "administrative record" of plaintiff's claim for benefits. Defendants' Motion For Summary Judgment/Adjudication, dated June 26, 2008 ("Def. Mtn.") at 4 n.1

in Merced, California (1999-2001), Chief Financial Officer of Pacific State Bank in Stockton, California (1994-1999), and a Financial Institutions Examiner for the Federal Deposit Insurance Corporation (1991-1993). He served in the United States Air Force for six years (1980-1986), and then obtained his Bachelor's degree in Business Administration/Finance from California State University in Sacramento. EA 488-489.

      **B.**      **Plaintiff's Claim For Disability Benefits**

      **1.**      **Salary Continuation and Short Term Disability Claim**

Plaintiff ceased working at Minnesota Methane on October 29, 2003, on which day he worked for four hours before leaving work dizzy and exhausted. E535, 537. Plaintiff received salary continuation benefits from his employer from October 29, 2003 until January 18, 2004. E536. During that time, he submitted a claim for short-term disability ("STD") benefits to The Hartford. E535-540.

Mr. Eppler's attending physician, Paul A. Waters, M.D., wrote on The Hartford's form that Mr. Eppler suffered "[s]evere limitation of [physical] functional capacity; incapable of minimal (sedentary) activity." E540. Dr. Waters hand-wrote that Mr. Eppler's "[i]mpairment is excessive sleepiness – unable to drive safely or spent time at desk without [illegible] to sleep." E540. Similarly, Mr. Eppler's General Manager at Minnesota Methane, Trond Aschehoug, attested that Mr. Eppler stopped working "[d]ue to sleep depravation (sic), could not function in his position. " E535. Dr. Waters' attending physician statement also informed The Hartford that Mr. Eppler had been referred to the Stanford University Hospital for further treatment.

Dr. Waters' Attending physician statement is signed and dated January 12, 2004. E540. On January 16, 2004, The Hartford approved Mr. Eppler's STD claim for the thirteen days from October 23, 2003 through November 11, 2003. EA 533-534. However, The Hartford did not pay him any STD benefits. Rather, The Hartford informed Mr. Eppler that he was eligible for California State Disability benefits, and that such benefits "could" exceed the amount of his STD benefits. EA 533. Accordingly, no benefits were payable by The Hartford. EA533.

The Hartford's January 16, 2004 letter also stated that it would close its file and pay no benefits for the period after November 11, 2003, unless within 10 days Mr. Eppler's

1  physician provided The Hartford with "additional information specifying your complications, treatment plan, treatment dates, limitations and restrictions preventing you from working. Also we will need an expected return to work date." EA533.

By February 10, 2004, The Hartford received further information from Mr. Eppler's physicians, E526-532, including an updated attending physician statement from Dr. Waters, in which he informed The Hartford that Mr. Eppler was expected to undergo nasal and facial surgery at Stanford Hospital. E526. The Hartford also received a copy of a letter dated December 17, 2003 from Scott Fromherz, M.D. and Christian Guilleminault, M.D. of Stanford Hospital to Dr. Waters. Dr. Guilleminault is the founder of Stanford Sleep Disorders Center, and is considered to be "without question one of the best-respected sleep medicine physicians in the world." Declaration of Julian M. Baum dated July 17, 2008, submitted herewith ("Baum Decl.") Exh. A at p.3 (letter dated July 16, 2008 from Thomas B. Lewis, M.D.)

Dr. Guilleminault's letter reviewed Mr. Eppler's medical history and the plan of treatment. As defendants point out, Mr. Eppler had a long history of excessive sleepiness dating back to childhood. E527. Over the years, Mr. Eppler's condition had worsened. In 2000 he was referred by Dr. Waters to a sleep specialist, Dr. Connolly at the Sierra Valley Lung and Sleep Medical Group. E527. By the time Mr. Eppler saw Dr. Guilleminault, his clinical test results showed dramatic dysfunction. Testing in August 2003 showed no "Stage 4 sleep" whatsoever, 75 arousals during the night, abnormal Multiple Sleep Latency Test ("MSLT") results, and an Epworth Sleepiness Scale ("ESS") score of 22. Thomas B. Lewis, M.D. describes the clinical significance of these test results in the record at EA691 and following. For example, Dr. Lewis explains that an ESS score of 10 or less is normal; the average score for a patient with narcolepsy is 18. EA 691, 699.

Mr. Eppler was treated with trials of several drugs, including phentermine, Wellbutrin, Provigil, Ritalin, Dexedrine and, finally, Adderall. He also employed the "CPAP" forced-air breathing device (Continuous Positive Airway Pressure – *see* EA 689), and Dr. Guilleminault noted that there were no problems with Mr. Eppler's compliance. E527.

1   Dr. Guilleminault determined that Mr. Eppler had "major anatomic abnormalities of his lower jaw and nose, and a history of waking with choking, even while being treated on BiPAP." E529 He recommended nasal surgery, and subsequent reevaluation for further surgery. E529. As discussed below, Mr. Eppler underwent three surgeries at Stanford, the first in March, 2004, the second in May, 2004 and the third in June 2004. E444.

On February 19, 2004, The Hartford approved STD benefits through March 16, 2004. E522. The Hartford noted that the maximum duration of potential STD benefits would be through April 28, 2004, and enclosed Long Term Disability Claim forms for Mr. Eppler, his employer and his physicians to complete, including a LTD Income Benefits Questionnaire, Attending Physician Statement, and forms for a listing of every treating physician and pharmacy Mr. Eppler had used since April 1, 2003. E522, 533. The Hartford requested this information within 21 days, and warned that Mr. Eppler's failure to provide it "will result in the termination of your claim." E524.

On March 18, 2004, The Hartford approved the extension of STD benefits through April 28, 2004, and acknowledged receipt of Mr. Eppler's Long Term Disability ("LTD") claim. E485.

**2.    Long Term Disability Claim**

**(a)    Approval of Reduced LTD Benefits**

On May 3, 2004, The Hartford asserted that Mr. Eppler's illness was a "preexisting condition" within the meaning of The Hartford's LTD policy. E463. However, The Hartford's letter stated that it was nonetheless approving Mr. Eppler's claim, at a lower level of monthly benefits, under Minnesota Methane's "Prior LTD Plan" and the "Continuity From a Prior Plan" provisions of The Hartford's LTD policy. E463-466.

**(b)    Termination of Mr. Eppler's LTD Benefits**

As the Hartford's Motion relates, The Hartford thereafter paid Mr. Eppler's monthly LTD benefits for two years, during which time it requested and obtained periodic updated information from Mr. Eppler and his physicians, and also required Mr. Eppler to apply for Social Security Disability Benefits, which he was awarded. *See*, *e.g*. E453 *et seq*. (Hartford

request to Dr. Waters for further medical records); E359 (Claimant Questionnaire filled out by Mr. Eppler, dated September 15, 2005).

As The Hartford also explains in its Motion, after 24 months of disability, Mr. Eppler would be deemed disabled under the commonly-labeled "any occupation" definition of disability. That 24 month period would end April 29, 2006. Def. Mtn. 8:10. Accordingly, as The Hartford acknowledges, by July, 2005, The Hartford engaged private investigators to place Mr. Eppler under surveillance. Def. Mtn. 9:8. *See also* EA 835-EA871. (investigative reports dated August 8, 2005, September 22, 2005, November 15, 2005 enclosing compact disc). The investigators conducted at least 9 days of surveillance, totaling between 20 and 80 hours. *Id*. In the words of their own Summary of Investigation, the private investigators observed Mr. Eppler:

> entering and exiting his vehicle, walking, conversing, standing, pacing, pulling an equipment bag, leaning against a baseball bat, swinging the baseball bat, jogging, and carrying an unidentified object. The subject appeared to ambulate in a normal manner without restrictions of any medical devices.

EA 836. *See also* still photographs at EA 870-871 ("Subject walking. Subject sitting. Subject standing. Subject descending steps. Subject carrying lawn edger. Subject entering vehicle.")

On March 1, 2006, Hartford Investigator James Budkus visited Mr. Eppler at Mr. Eppler's home in Stockton. Def. Mtn. 9:16. Mr. Budkus is apparently the individual identified as "The Investigator" in what appears to be his report of the encounter. E081. The purpose of his visit was to confront Mr. Eppler with videotape of his surveillance and to document his reaction. E081. Mr. Budkus obtained nothing useful to The Hartford. E081-83. Def. Mtn. 9:20. In fact, Mr. Budkus reported to The Hartford that at times in the interview Mr. Eppler appeared to lose his train of thought, and required Mr. Budkus to repeat his questions. E176.

The Hartford was undeterred. On April 6, 2006, its nurse case manager, Jody Wilkins, RN, CCM wrote to three of Mr. Eppler's treating physicians. E214-230. Nurse Wilkins represented to the doctors that Mr. Eppler had been videotaped and interviewed, and that "[t]here are discrepancies between Mr. Eppler's reported symptoms or limitations, the documented medical information or restrictions on file, and/or the investigative findings." E227. Nurse Wilkins' letter offered four bullet-point "examples." *Id.*

1    Nurse Wilkins' letter then offered each of the three doctors a remarkable choice.
2    They could either
3    (1)   Countersign Nurse Wilkins' letter, indicating agreement that The Hartford's investigation
4          had shown that Mr. Eppler is not precluded from full-time "sedentary to light work;" or
5    (2)   Disagree with The Hartford, and set forth in five lines Mr. Eppler's restrictions, the
6          doctors' clinical rationale, and all objective reports, testing and physician consultations
7          which supporting the doctors' opinion; or
8    (3)   "[] defer to the opinion and functional assessment of Dr. Paul Waters who most recently
9          completed this patient's disability forms.
10   E228.
11          The three doctors were (1) Paul Waters, M.D., who was Mr. Eppler's primary treating
12   physician, (2) Jerry Crooks, M.D., a consulting physician, who in turn had referred Mr. Eppler
13   to (3) Dr. Gannon for nerve conduction studies and evaluation of his back pain. E245.
14          Dr. Waters indicated that he disagreed with The Hartford's "opinion," and wrote
15   "As per my conversation with Jody Wilkins, I would prefer and request an outside evaluator as
16   well as Dr. Gannon and Dr. Crooks to make the determination of this individual's disability."
17   E218.
18          Dr. Crooks chose to defer to Dr. Gannon. E219. Dr. Gannon, however, signed
19   The Hartford's proffered conclusion. E220.
20          With no further medical investigation and without heeding Dr. Water's request for
21   an outside evaluator, and without any contact with the specialist treating physicians at Stanford,
22   or sleep specialist Dr. Jon Connolly, The Hartford promptly terminated Mr. Eppler's benefits
23   claim by letter dated April 28, 2006. E165-172.

   **C.   The Hartford's Court-Ordered Review on Remand**

   **(1)   The Court's Order**

26          By order dated February 11, 2008, this Court remanded the claim to The Hartford,
27   to conduct an administrative review and reconsideration of Mr. Eppler's claim. EA 716. The
28   Court also specifically directed The Hartford to consider in that review the written report dated

July 7, 2007 by Thomas B. Lewis, M.D.. EA 716. Dr. Lewis is board certified in Psychiatry and Neurology, and is on the clinical teaching staff at the University of California, San Francisco. EA 699, and Baum Decl. Exh A. Dr. Lewis has lectured in numerous professional settings on the pathophysiology of sleep disorders as they relate to impairments of daytime wakefulness and cognition. Baum Decl. Exh. A at p.5. He has also treated many patients with obstructive sleep apnea whose symptoms, like Mr. Eppler's, persist after CPAP treatment. *Id*. Dr. Lewis had examined Mr. Eppler for two hours, reviewed his medical records, reviewed The Hartford's videotape of Mr. Eppler, and had spoken to Dr. Gannon. EA 698.

Dr. Lewis' report is exhaustive, for all its relative brevity. Since defendants rely heavily on the signed statements by Drs. Gannon and Waters, Dr. Lewis addressed them specifically:

> No speculation is necessary as to what Dr. Gannon meant when he signed the letter from Nurse Case Manager Wilkins saying that Mr. Eppler could perform light work. When I spoke with Dr. Gannon, he was unambiguous in stating that his endorsement of the pre-written statement pertained only to Mr. Eppler's physical ability to perform activity, that **he had not assessed and would not have been able to comment on the status of Mr. Eppler's cognitive function.** The fact that Dr. Gannon signed the letter from Hartford does not, therefore, constitute any evidence whatsoever about Mr. Eppler's sleep or daytime fatigue, somnolence, and cognitive impairment.

EA 698-699 (emphasis added).

Dr. Lewis' report also noted the following with respect to Dr. Waters:

> In his chart notes of May 18, 2006, Dr. Waters wrote, "They have discontinued it [Mr. Eppler's disability payments] on the basis of his ability to sit, stand, walk, etc., but, as the patient points out, the whole point of his disability revolves around the fact that he has hypersomnolence. He is unable to stay awake on the job for any period of time. He has experienced significant verbal impairment. He loses his chain of thought and is unable to carry on an ongoing conversation. This is the major reason he is unable to work."

EA 692-693.

**(2)   The Hartford's Review**

By order dated February 19, 2008, the Court ordered this litigation stayed pending The Hartford's review of plaintiff's claim "which review shall be completed in accordance with the requirements of 29 C.F.R. section 2560.503-1." Those regulations set forth the time limits

1  for completion of claim review, and particular requirements of the "full and fair review"
2  mandated by ERISA.
3       The record appears to show that The Hartford did *not* comply with the Court's
4  orders, or with the applicable ERISA regulations. Under ERISA, a claims fiduciary must As part
5  of the "full and fair review" mandated by ERISA, plan fiduciaries must consult with medical
6  professionals who have appropriate training and experience in the relevant field of medicine. 29
7  C.F.R. § 2560.503-1(h)(iii). *See also Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956, 974
8  (C.D. Cal. 2005)(insurer breached its fiduciary duties in having plaintiff's medical records
9  reviewed by a claims professional rather than a medical professional.) They must act diligently
10 to complete that review and make a determination of plaintiff's claim within 45 days, unless
11 "special circumstances" require additional time. In that case, the claims fiduciary may have an
12 additional 45 days to complete its review. 29 C.F.R. § 2560.503-1(i)(1)(i) and (i)(3)(i).
13 *Kowalski v. Farella, Braun & Martel, LLP*, 2007 WL 1342475 (N.D. Cal. 2007).
14      The record appears to show that The Hartford *did nothing* to review plaintiff's
15 claim during that initial 45 day period, other than to write to plaintiff's counsel that it had
16 determined that it needed more time. Not even Dr. Lewis' report was reviewed, despite this
17 Court's specific direction that The Hartford do so. On February 27, 2008, plaintiff's counsel
18 wrote to defendants' counsel, requesting that The Hartford, as part of its review on remand by
19 the Court, agree to have Mr. Eppler examined by an independent specialist physician to be
20 selected jointly by the parties counsel. EA 1034. Defendants made no response. Rather, on
21 March 27, 2008, the 45th day of their review, The Hartford filed with the Court a Status Report
22 stating that it had "determined that an independent medical record review will be required" but
23 that "an independent medical examination would not be helpful." The Hartford represented that
24 "the file is being sent to an outside medical consultant for an opinion."
25      It does not appear, however, that The Hartford had in fact sent the file to such an
26 outside medical consultant, or conducted any other substantive review of plaintiff's claim. The
27 first reference in the file is a "Referral Form" dated March 28, 2008, EA 1025-1026.
28

On April 22, 2008, plaintiff's counsel wrote to defendants, requesting copies of the additional materials generated and/or reviewed by The Hartford to date, so that Mr. Eppler and his physicians might respond. EA 1035. Defendants responded by letter dated April 29, 2008. Baum Decl. Exh B. Defendants stated that "[t]his will confirm that you have all such materials to date. A copy of the medical reviewer's report on this review will be sent to you when it is complete." This statement was also inaccurate. The record proffered by defendants with their motion includes an April 17, 2008 Medical Record Review by Dr. Andrew Filderman of University Disability Consultants, addressed to Christopher Davis of The Hartford. Dr. Filderman's report makes no mention whatsoever of Dr. Lewis' report, despite the Court's order that the Hartford consider it.

The record now produced by The Hartford, which it represents to the Court to be a complete record of the administrative record, also shows no action on the file, at the time of The Hartford's first Status Report to the Court on March 27, 2008, other than assignment of the matter to Christopher B. Davis of The Hartford's Appeals Unit. *See* Declaration of Christopher B. Davis, dated June 26, 2008, at paragraph 4. Plaintiff's April 22, 2008 letter also "respectfully requested that The Hartford arrange for the medical professionals reviewing Mr. Eppler's claim to consult Dr. Thomas B. Lewis, whose report you have, and who examined Mr. Eppler."

The Hartford also did not comply with the 90-day "special circumstances" deadline of the ERISA regulations (and this Court's order). Rather, on May 9, 2008, The Hartford filed a Second 45-Day Status Report representing to the Court that The Hartford's medical consultant had had difficulty reaching Dr. Lewis, and that The Hartford expected to make a final report to the Court within 10 to 14 days. This statement also appears to be untrue. Dr. Filderman first contacted Dr. Lewis on Thursday, May 8, 2008 (the day before The Hartford's Status Report to the Court). EA 1019. Dr. Lewis replied that same day by e-mail, saying that he could make time to talk with Dr. Filderman two business days later, on Monday, May 12. EA 1019. Dr. Filderman made no reply until Wednesday, May 14, 2008. EA 1019. Dr. Lewis again responded immediately (within 3 hours) and offered to speak with Dr. Filderman by telephone on Monday, May 19, at 11 am PST. EA 1019.

1    Dr. Filderman then wrote an Addendum to Medical Record Review of Mark
Eppler, dated May 28, 2008. EA 1012, reflecting his review of Dr. Lewis' written report and his
conversation with Dr. Lewis on May 19, 2008.

The next action reflected in the record is The Hartford's letter dated June 5, 2008
to plaintiff's counsel, denying Mr. Eppler's claim. EA 997-1006. Neither Dr. Filderman's
reports, nor anything else, was produced to plaintiff's counsel before defendants filed their
Motion on June 26, 2008.

Plaintiff's counsel thereafter provided Dr. Filderman's reports, and Defendants'
Motion to Dr. Lewis for his review and comments. His response, dated July 16, 2008, is
submitted herewith as Baum Decl. Exhibit A.

## III.   ARGUMENT

### A.   Standard of Review

Defendants do not and cannot satisfy their burden of proof to show that the Court should employ the "abuse of discretion" standard of judicial review. In order to invoke that standard of review, defendants must show that (1) the ERISA plan expressly allows the plan fiduciary to delegate discretionary authority to the plan insurer; and (2) that the ERISA plan actually did so, in writing. *E.g. Shane v. Albertson's Inc. Employees Disability Plan*, 381 F.Supp.2d 1196, 1202-1203 (C.D. Cal. 2005). Defendants have not and cannot make that showing. Defendants point only to discretionary language in a Certificate of Insurance, which is not the ERISA plan. Moreover, defendants have failed even to proffer a Summary Plan Description authored, or even authenticated by a Plan fiduciary. This is significant in that under well-established law, the terms of the Summary Plan Description (which is required by ERISA) will govern over a certificate of insurance, a group disability policy, or even the Plan itself if its terms are more favorable to the insured. *Banuelos v. Const. Laborers' Trust Funds*, 382 F.3d 897, 904 (9th Cir. 2004).

///

### B. The Hartford's Decision Was An Abuse of Discretion

Even if the Court were to review The Hartford's decision for abuse of discretion, under well-established law The Hartford fails that test as well. A claims fiduciary abuses its discretion where

- it fails to inquire into and make an adequate investigation into the conflicting opinions of medical professionals, *Wible v. Aetna Life Insurance Co.*, 375 F. Supp. 2d 956, 968 (C.D. Cal. 2005); *Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1122-1123 (9th Cir. 1998). Thus, the insurer may not simply choose the medical opinion it favors;

- it conducts a "selective review" of the medical evidence, *e.g. Spangler v. Lockheed Martin Energy Systems*, 313 F.3d 356, 362 (6th Cir 2002);

- it fails to "make a reasoned assessment of whether the total combination of a claimant's impairments justify a disability finding, even if no single impairment standing alone would warrant the conclusion." *Nickola v. CNA Group Life Assur. Co.*, 2005 U.S. Dist. Lexis 8559 at *30 (N.D. Ill. 2005);

- the decision to deny benefits is clearly erroneous as shown by the entire administrative record. "An administrator also abuses its discretion if it relies on clearly erroneous findings of fact in making benefit determinations." *McAdams v. Westinghouse Long Term Disability Plan 503*, 1999 WL 1012319 (N.D. Cal. 1999)(quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 944 (9th Cir. 1999).

Here, The Hartford did all of those things. Most strikingly, even Dr. Filderman does not support The Hartford's position. Rather, as his report makes clear, and as Dr. Lewis discusses, Dr. Filderman expressly limited his opinion to state that he deems Mr. Eppler not to be disabled *solely* by his primary sleep apnea, and acknowledges that Mr. Eppler may very well be unable to function in the workplace as a result of his overall medical condition.

### C. Request for Discovery under Fed. R. Civ. P. 56(f)

Plaintiff respectfully submits that the Court need not consider further evidence in order properly to rule that plaintiff is entitled to recover his disability benefits. However, if the Court deems the record insufficient for that purpose, plaintiff respectfully requests that the Court

permit plaintiff to conduct limited discovery under Fed. R. Civ. P. 56(f) and *Glenn v. Metropolitan Life Ins. Co.,* 128 S.Ct. 2343 (2008) so that the Court may, as *Glenn* directs, consider the entirety of the circumstances in deciding how much weight, if any, to give to The Hartford's structural conflict of interest in this case.

## IV.    CONCLUSION

For these reasons, plaintiff respectfully requests that the Court deny defendants' motion, and rule that defendants wrongfully terminated payment of plaintiff's disability claim.

Dated July 17, 2008

    Respectfully submitted,

    JULIAN M. BAUM
    THOMAS J. FUCHS
    BAUM & WEEMS

    *Signed by Julian M. Baum*

By: _____
    JULIAN M. BAUM
    Attorneys for Plaintiff
    MARK EPPLER