# Thomas B. Lewis, M.D.

350 Parnassus Avenue • Suite 909 • San Francisco, California • 94117
Phone 415-664-6929 • Fax 815-550-7887 • email tom@thomaslewis.com
www.thomaslewis.com

Wednesday, July 16, 2008

To:     Julian Baum
        133 Peralta Ave
        Mill Valley, CA  94941

Re:     Mark Eppler
        DOB 6/10/61

Dear Mr. Baum:

Thank you for inviting me to comment on the two reports by Dr. Filderman, the "Medical Record Review," (MRR) and the "Addendum to Medical Record Review" (Add.) regarding Mr. Eppler, and the June 26th Defendant's Motion. My impression from Dr. Filderman's material is that his opinion in his initial report "Medical Record Review" and his opinion in his "Addendum" differ slightly. In addition, my opinion diverges from both of Dr. Filderman's in significant ways. The Defendant's Motion contains also some items that I would like to clarify and correct.

In very brief review: Mr. Eppler is a 47 year old man who developed severe daytime sleepiness and cognitive slowing and was eventually diagnosed with a severe case of obstructive sleep apnea (OSA). This is a man who was so drowsy during the day that he drove his car into his garage door. He underwent a number of treatments for his condition, including various forms of continuous positive airway pressure (CPAP), large doses of wakefulness-promoting medications, and surgery to make the anatomy of his head and neck more conducive to nocturnal airflow. The end result of these treatments was twofold: 1. His ability to move air in and out of his lungs during sleep and to oxygenate his tissues improved greatly. 2. His ability to maintain normal daytime wakefulness did not improve.

This is something of a puzzle, as we usually see these two factors correlated: when ventilation is poor (and hence arousals from sleep are numerous), daytime wakefulness usually declines. When ventilation is good (and hence arousals from sleep are few), daytime wakefulness usually improves. In fact, our current (and undoubtedly simplistic) understanding of the pathophysiology of OSA could be stated like this:  lack of ventilation during sleep *causes* the brain to arouse from sleep which *causes* repetitive sleep interruption which *causes* impairment in daytime somnolence and cognitive function. Is there usually severe daytime somnolence and cognitive slowing without a lack of ventilation? Ordinarily, we would think not. However, Mr. Eppler's case demonstrates that complicated variants of usual illnesses do occur.

Mr. Eppler's illness has proven to be surprising for his physicians in several ways. For instance, the surgical treatment Mr. Eppler underwent at Stanford in May 2004 improved his ventilation numbers, but the procedure did not improve his cognitive functionality. With the substantial benefit of 20/20 hindsight, we can see that this should not have been a complete

1

surprise. His post-CPAP sleep study of December 2002 *already* showed an unusual de-coupling of his oxygenation, and his arousals and daytime somnolence. In that study his oxygenation was good, but he had 98 arousals during the night, and he remained severely symptomatic during the day. As Dr. Connolly, his sleep medicine physician, wrote at the time, "review of his last sleep study does show that *even though the respiratory events were dramatically better on BiPAP, he still had multiple awakenings of unclear etiology….Clearly, he does have excessive daytime sleepiness, which may be due to multiple interruptions of his sleep of unclear etiology.*" (Emphasis mine.) In August of 2003, Mr. Eppler had another polysomnogram, with very similar results. He also underwent an objective test of daytime somnolence, the sleep latency test, at that time. In Dr. Filderman's words, that test was "highly abnormal" and "confirmed pathological sleepiness with a markedly shortened sleep latency," and I quite agree. In addition, take note of the fact that this highly abnormal daytime test was performed at a time when the patient was on a regimen of CPAP that was *demonstrably effective* for his ventilation and oxygenation. That same regimen was evidently *ineffective* at producing normal daytime wakefulness.

Thus Mr. Eppler does not evidence a case of "usual," uncomplicated OSA.  In the usual version of OSA, the patient's ventilation, his arousals, and his daytime wakefulness are coupled: improving the ventilation reduces the arousals and improves the daytime wakefulness. (*Normalizing* the oxygenation often does not produce *normalization* of daytime wakefulness, but that is another matter.) Mr. Eppler's disease did not behave in this fashion. His daytime somnolence did *not* respond to a series of very energetic medical treatments delivered by excellent physicians.

Dr. Filderman and I diverge in our basic approach to the problem posed by Mr. Eppler's complicated illness. Dr. Filderman (in MRR) gives exclusive primacy to the ventilation numbers: he notes that Mr. Eppler's ventilation numbers after BiPAP are consistent with mild OSA, and he concludes from this that the patient has mild OSA. However, mild OSA does not produce many of the other features known to be associated with this case: severe daytime somnolence, significant cognitive slowing, the prescription of very large doses of powerful stimulants, a very abnormal MSLT, the opinions of multiple sleep medicine physicians that the patient has a severe problem that needs to be remedied.  Dr. Filderman (MRR) then concludes repeatedly that some of these features "should not" or "would not" exist.

The problem with Dr. Filderman's hypothesis, it seems to me, is that these features are already *known* to exist. If a theory requires, in order to achieve validity, that a number of known facts be dismissed, then the theory itself is problematic. In reality, Mr. Eppler has these symptoms. Either they are authentic, in which case he is significantly impaired, or they are manufactured, in which case he is malingering. In either case, they are real elements of a real situation that demand explanation, and cannot satisfactorily be defined away by saying that they "should not" or "would not" exist.

Dr. Filderman writes, "I believe that BiPAP therapy was successful at ameliorating the obstructive sleep apnea symptoms to a point where there would be minimal affect (sic) on daytime functionality." However, regardless of what "would" or "should" be expected, the actual fact of the matter is that BiPAP therapy *did not* ameliorate Mr. Eppler's daytime functionality. This state of affairs could well have been produced, as Dr. Connolly noted at the time, by an unknown factor of "unclear etiology" that caused an unusual de-coupling of his oxygenation and arousals/daytime wakefulness.

Let us call that unknown factor "X." We do not know the exact identity of X in this case. X could be another sleep disorder like idiopathic hypersomolence, as Dr. Filderman (in his later"Addendum") very plausibly hypothesizes. X could be, as Dr. Filderman notes, an "unrelated CNS process." X could be neuronal loss due to repeated hypoxia. X could be the interaction of apneic hypoxia with the abnormal tendency to coagulate that Mr. Eppler's physicians have long suspected but could never identify.  X could be Mr. Eppler's astoundingly high triglyceride level. X could even be some feature of the pathophysiology of OSA that we do not yet understand, because medical science clearly does not understand everything about the pathophysiology of OSA. The exact identity of X in this case is a fascinating medical question, and it would undoubtedly make for a very interesting Grand Rounds presentation and discussion.

We do not need to identify X, however, in order to answer the question at issue here: *Is Mr. Eppler disabled by a medical illness?*  The evidence demonstrates that he is. He first had severe OSA, documented by numerous objective tests, and he had daytime symptoms and impairments in every way compatible with that disease. His doctors successfully treated the abnormal ventilation that is one manifestation of that disease, but another manifestation – his daytime somnolence and cognitive dysfunction  – did not improve. This lack of improvement  was evidenced not only by the continuation of the same symptoms but also by the objective test of wakefulness, the sleep latency test, that was "highly abnormal" and that "confirmed pathological sleepiness" *after* CPAP had already normalized Mr. Eppler's oxygenation status. Somehow, Mr. Eppler's illness has decoupled these two factors that we usually think of as correlated – nocturnal ventilation/oxygenation and daytime wakefulness.

Dr. Filderman contends that after BiPAP, Mr. Eppler's sleep was essentially normal, and that any abnormalities on the subsequent polysomnograms can be accounted for on the basis of artifacts introduced by the testing procedure itself. However, the sleep specialist physicians who examined and treated Mr. Eppler were of the opinion that even after BiPAP effectively improved his ventilation, Mr. Eppler's sleep was markedly abnormal in a way that was likely to cause significant symptoms.  Dr. Connolly, his first sleep physician, *explicitly said so*: "review of his last sleep study does show that…. he still had multiple awakenings of unclear etiology….Clearly, he does have excessive daytime sleepiness, which may be due to multiple interruptions of his sleep of unclear etiology." Dr. Guilleminault later hypothesized an anatomical cause for Mr. Eppler's ongoing sleep abnormalities and his daytime symptoms  – mandibular dysfunction – and he proposed major surgery as a corrective measure. Dr. Guilleminault founded the Stanford Sleep Disorders Center; he is without question one of the best-respected sleep medicine physicians in the world. If Mr. Eppler's sleep architecture was minimally abnormal after BiPAP, with little effect on daytime functionality (as Dr. Filderman contends), what exactly was Dr. Guilleminault intending to correct?

It seems to me unimportant what we call the disease that has plagued Mr. Eppler -- whether we call it "severe OSA" or "treatment-resistant OSA" or "complicated OSA" or "OSA + X." The illness began as OSA, and his symptoms are still consistent with that disorder, but the de-coupling of nocturnal ventilation, sleep arousals, and daytime wakefulness is unusual. Dr. Filderman maintains that Mr. Eppler's symptoms do not conform to the "usual course of OSA," which strikes me as completely fair.  We could call it a distinctly unusual course of OSA. Whatever we call the physiological process that has produced Mr. Eppler's symptoms and impairments, however, does not alter those impairments.

As I contend above, Mr. Eppler's symptoms are either authentic, in which case he is impaired, or they are manufactured. The hypothesis of malingering would require that Mr. Eppler be able to induce false results on objective medical tests, which seems less than probable. It would also require him to be such a dedicated malingerer that he would willingly subject himself to an operation that rearranged the anatomy of his face, mouth, and throat in order to make it appear as though he were sincere in the effort to remedy a problem he didn't actually have. I have never seen this level of enthusiasm for malingering.

In addition, Mr. Eppler did not impress his treating physicians as a malingerer. Instead, the behavior of his doctors indicates to me that they saw him as a man who was ill and in need of considerable medical attention. Dr. Waters' notes make it quite clear that he was very concerned about his patient's deteriorating level of function. Dr. Waters referred him to Dr. Connolly and Dr. Gannon for further investigation. Dr. Gannon opined in his letter to Dr. Waters that "ongoing inadequately treated obstructive sleep apnea could cause at least some of these symptoms." Dr. Connolly attempted without success to treat Mr. Eppler and then referred him to Dr. Guilleminault at Stanford. Dr. Guilleminault then referred him to the Stanford head and neck surgeons, who then carried out an extensive and painful set of surgical procedures. All of these physicians were convinced that Mr. Eppler had a real medical problem that should plausibly have a real medical solution. None of them, as far as I have been able to determine, expressed any doubt about the essential fact that they saw Mr. Eppler as medically ill, significantly symptomatic, and in need of treatment. The last visit that he had at the Stanford Sleep Disorders Center, in fact, shows that the doctors there were seriously contemplating performing radiofrequency ablation – i.e., *additional* procedures. This does not sound like a situation in which Mr. Eppler's physicians thought either that he was faking or that he did not really have a significant problem.

In summary, Dr. Filderman's "Medical Record Review" seems problematic to me in that it proposes a theory (Mr. Eppler has mild OSA) that requires outright dismissal of the many facts incompatible with that theory. In Dr. Filderman's "Addendum," he writes "Is certainly possible that Mr. Eppler has a second sleep abnormality (e.g., idiopathic hypersomnolence/narcolepsy) or unrelated CNS process that would result in his current symptoms." This seems to me to be a different hypothesis, and one that more readily accommodates the facts of the case.

I would like now to correct and comment on some misperceptions contained in the most recent Defendant's Motion.

1. The Defendant's Motion states that "Dr. Filderman opined that Dr. Lewis' conclusions were not fully supported by the medical record." (p 13). In fact, I can find no such statement in Dr. Filderman's report (entitled "Medical Record Review") or in his Addendum to this report.

2. The Defendant's Motion states that "Overall, Dr. Filderman concluded that plaintiff should be able to work full time, perhaps with periods of rest due to his mild sleepiness." (p. 13). This statement does not accurately summarize Dr. Filderman's conclusions. Dr. Filderman (MRR) writes several times that mild OSA alone would not ordinarily be a cause of significant impairment. (E.g, "The best that can be stated is that mild

obstructive sleep apnea and mildly abnormal sleep architecture should not result in significant restrictions or limitations in functionality." p. 4) However, the question at hand is not whether mild obstructive sleep apnea is disabling, but *whether Mr. Eppler is disabled*, a separate and distinct issue. In his "Addendum," Dr. Filderman goes on to hypothesize that Mr. Eppler may have a second sleep disorder, an unrelated CNS process, an ongoing neurologic disorder, or a metabolic abnormality "which would explain his symptoms." (Addendum p. 4)  He acknowledges that mild OSA would explain neither Mr. Eppler's symptoms nor his "highly abnormal" MSLT, and he acknowledges earlier (p. 5) that the unusually large doses of stimulants that Mr. Eppler requires for minimal functionality "normally…would not be necessary for mild obstructive sleep apnea." In all of these instances, he acknowledges the likelihood that mild OSA does not constitute the entirety of Mr. Eppler's medical situation, and by extension renders moot the discussion of what impairments mild OSA would or should be expected to produce.

3.  The Defendant's Motion mentions that Dr. Filderman is a specialist in sleep medicine and pulmonary medicine, and that I am a psychiatrist. This might naturally prompt a reader to wonder about the relevance of a psychiatrist's opinion in a case that has so much to do with nocturnal ventilation. In the interests of clarity, I should make clear that I am a Diplomate of the American Board of Psychiatry and Neurology, and I have lectured in numerous professional settings on the pathophysiology of sleep disorders as they relate to impairments of daytime wakefulness and cognition. I have also treated many patients with OSA who demonstrate daytime symptomatology that persists after CPAP treatment.

4.  The Defendant's Motion again makes mention of the videotape of Mr. Eppler relaxing at a baseball game.  Dr. Filderman and I appear to be in agreement that the videotape is not relevant to the medical illness under discussion here.        (Dr. Filderman's report, p. 6)

5.  Both the Defendant's Motion and Dr. Filderman's report mention that I would find further testing of Mr. Eppler to be of interest. This issue seems to require clarification.  I would certainly be *interested* to see the results of further testing on Mr. Eppler. That is because I find his medical problem fascinating, and certain elements of that problem remain obscure. I would be very interested to see not only the results of further sleep testing, but also a high-definition MRI, a PET scan, a functional MRI scan, and so forth. The issue of my *interest* in seeing the results of these tests is an issue quite separate from my having *the viewpoint that such tests are necessary* in order to form a medical opinion with a reasonable degree of certainty. I do not hold that viewpoint. In my opinion, there is more than sufficient evidence to draw the conclusion that Mr. Eppler is disabled by a medical illness. There is, in fact, a surfeit of such evidence. I certainly welcome the results of any testing done on Mr. Eppler, and I will read the results with interest, but we do not need such tests to confirm the fairly prosaic truth:  he started with severe OSA and was severely symptomatic from it; every sleep specialist he has seen has thought he had a real medical problem that plausibly had a real medical solution, but that his disease has proven itself extraordinarily treatment resistant, and we don't know why.

I understand that this letter may be submitted to the Court in Mr. Eppler's ongoing lawsuit. Accordingly, I declare as follows:

I hereby declare, under penalty of perjury under the laws of the United States, that the foregoing fully, correctly and truthfully sets forth my clinical observations, my review of the referenced medical records, and my professional medical opinions.

Sincerely,

Thomas B. Lewis, M.D.

Diplomate, American Board of Psychiatry and Neurology
Assistant Clinical Professor
University of California, San Francisco
School of Medicine