1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARK EPPLER, an individual,

     Plaintiff,

  v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY, LONG
TERM DISABILITY AND LIFE PLAN
FOR EMPLOYEES OF MINNESOTA
METHANE LLC,

     Defendants.
_____/

No. C 07-04696 WHA

**ORDER GRANTING
DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

**INTRODUCTION**

     In this ERISA disability-benefits action, plaintiff Mark Eppler sued defendant Hartford

Life and Accident Insurance Company and defendant Long Term Disability and Life Plan for

Employees of Minnesota Methane LLC, for wrongfully terminating his long-term disability

("LTD") benefits. Defendants move for summary judgment, maintaining that Hartford, the

claim administrator, did not abuse its discretion. For the reasons stated below, the motion is

**GRANTED**.

**STATEMENT**

     Plaintiff Mark Eppler was employed as a company controller by Minnesota Methane

LLC. He also participated in an employee welfare-benefit plan governed by ERISA. The plan

designated Hartford as the claims fiduciary. Hartford was responsible for interpreting the

**United States District Court**
For the Northern District of California

1  policy and determining eligibility for benefits.  Mr. Eppler suffered from a severe form of sleep

2  apnea with hypersomnia.  On October 29, 2003, he stopped working, claiming sleep

3  deprivation, fatigue, and the inability to think, concentrate, and stay awake.  Hartford ultimately

4  granted Mr. Eppler short-term disability benefits from October 30, 2003, through April 28,

5  2004, and approved his claim for long-term benefits from April 29, 2004, through April 29,

6  2006.  Mr. Eppler's policy allowed for 24 months worth of payments for disability from Mr.

7  Eppler's *own* occupation, with benefits payable thereafter to age 65 for continuing disability

8  from *any* occupation.  Mr. Eppler, on the advice of Hartford, also applied for Social Security

9  Disability benefits, which were granted in July 2005, with payments retroactive to April 2004.

10       While on disability, Mr. Eppler received treatment for his sleep condition at the Stanford

11  University Medical Center Sleep Clinic.  In March 2004, he underwent maxillomandibular

12  advancement surgery at Stanford, with two additional procedures in May and June.  The success

13  of the surgeries is unclear.  As of November 2004, Mr. Eppler continued to report excessive

14  daytime sleepiness and problems with memory and concentration.  His diagnosis continued to

15  be "hypersomnia — sleep apnea" (E 444).  At the same time, Mr. Eppler's primary care

16  physician, Dr. Paul A. Waters, characterized Mr. Eppler's progress as "improved" (E 444,

17  E 010), and a report by the Stanford clinic noted that Mr. Eppler's November 2004 sleep study

18  showed "significant improvement" (E 318).

19       In early 2005, Mr. Eppler fell and injured his hip and arm and began complaining of

20  lower back and shoulder pain as well as leg pain and weakness.  An MRI suggested that he had

21  a herniated disc with nerve impingement.

22       As the end of Mr. Eppler's "own occupation" period neared, Hartford began its work of

23  determining whether he would qualify for benefits under the "any occupation" definition of

24  total disability.  In order to continue receiving benefits, Mr. Eppler had to demonstrate that he

25  was "prevented from performing one or more of the essential duties of any occupation."

26  According to the plan, "any occupation" means (EA 654):

27           an occupation for which you are qualified by education, training
             or experience, and that has an earnings potential greater than an
28           amount equal to the lesser of the product of your Indexed

2

**United States District Court**
For the Northern District of California

Pre-disability Earnings and the Benefit Percentage and the
Maximum Monthly Benefit shown in the Schedule of Insurance.

In his September 2005 claimant questionnaire, Mr. Eppler continued to report excessive daytime sleepiness and cognitive problems, and he stated that his joints were deteriorating. His 2005 medical records increasingly reflected complaints of orthopedic problems and joint pain, for which he received steroid injections, epidurals, and physical therapy. Dr. Peter M. Gannon, who specializes in internal medicine and neurology, conducted testing of Mr. Eppler related to both his sleep and pain concerns. These tests, some of which were conducted before Mr. Eppler's maxillomandibular advancement surgery and some after, included an MRI, a neurological examination, a nerve conduction study, and an EEG. The results were all normal.

As part of its assessment of Mr. Eppler's eligibility for continued LTD benefits, Hartford also conducted video surveillance of Mr. Eppler in August, September, and November 2005. In the surveillance videos, Mr. Eppler can be viewed attending a baseball game, doing yard work, driving, walking, and standing continuously for about 34 minutes, among other things. This Court has viewed the videos and agrees with Hartford that they contrast markedly with Mr. Eppler's self-described limitations. Mr. Eppler reported to the Hartford investigator that he could not drive "any distances," that it took him approximately twenty minutes to walk one block, that he walked slowly and with a limp, and that he could only stand for ten or fifteen minutes (E 169). These statements are all contradicted by the surveillance. Upon viewing the videos, Mr. Eppler indicated that they represented an above average level of functionality for him (E 092).

When Mr. Eppler was interviewed by the investigator, he did, however, appear "very lethargic," had "heavy eyes," reported that his back was bothering him, moved slowly, lost his train of thought with some frequency, and asked the investigator to repeat his questions (E 176). Hartford concluded that Mr. Eppler's "presentation during the interview and [his] reported level of functionality during the claimant interview was inconsistent with [his] observed activities during the surveillance (*ibid*.).

The claim file was then reviewed by a medical case manager, who sent Mr. Eppler's physicians the results of the surveillance and the results of Mr. Eppler's interview with the

United States District Court

For the Northern District of California

1    investigator.  Dr. Gannon signed a statement indicating that he believed Mr. Eppler was capable

2    of performing sedentary to light full-time work as long as he was provided the opportunity to

3    change positions as needed (E 220).  Dr. Jerry Crooks, an orthopedist, deferred to Dr. Gannon's

4    opinion.  Dr. Waters noted that he would prefer an outside medical evaluator, as well as

5    Drs. Gannon and Crooks, to make the determination of Mr. Eppler's disability (E 218).  In an

6    April 2006 phone conversation with the case manager, Dr. Waters stated that he thought

7    Mr. Eppler's sleepiness had improved after the surgeries and that Mr. Eppler's self-reported

8    limitations were much greater than those exhibited in the surveillance video.

9         In a letter dated April 28, 2006, Hartford notified Mr. Eppler that it had determined that

10    the evidence submitted in support of his claim did not establish that he continued to meet the

11    policy definition of "disability" or "disabled."  The letter defined relevant terms and included

12    where they could be found in Minnesota Methane's LTD plan booklet for Policy GLT 302812.

13    In addition, the letter quoted the part of the policy stating that benefit payments terminated on

14    the date the claimant was no longer "disabled" as defined.  Twenty-two sources — including

15    questionnaires, medical records, and the surveillance videos — were listed, constituting the

16    record upon which the decision was based.  Hartford had also performed an employability

17    analysis, which generated a list of occupations that Hartford believed Mr. Eppler was able to

18    perform, including Chief Bank Examiner, Controller, Investment Analyst, and Treasurer

19    (E 179–80).  The letter notified Mr. Eppler that, if he did not agree with Hartford's denial, he

20    had 180 days from his receipt of the letter to appeal.

21         Significantly, more than five months of the 180-day period went by with no action by

22    Mr. Eppler, and then in the last month of the appeal period, Mr. Eppler's counsel sent a letter

23    asking for documents to review for use in an appeal.  Hartford sent documents in reply and

24    gave Mr. Eppler an extension to December 4 to make the appeal.  Though the following fact is

25    disputed, Mr. Eppler's counsel has sworn under oath that he wrote to Hartford again on

26    November 30, 2006 requesting additional documents.  Defendants claim not to have received

27    that letter or any further correspondence from Mr. Eppler, and they closed the file on

28    December 4.

4

United States District Court

For the Northern District of California

1     Mr. Eppler filed suit on September 12, 2007.  He sought long-term disability benefits

2    allegedly due under the ERISA plan and damages resulting from breach of fiduciary duty and

3    statutory penalties.  After the litigation had begun, Mr. Eppler's counsel claimed that a medical

4    report had been sent to Hartford to support Mr. Eppler's appeal.  In late November 2007,

5    Mr. Eppler's counsel forwarded to defendants a copy of the medical report, dated July 7, 2007,

6    by Dr. Thomas Lewis.  Dr. Lewis, after meeting with Mr. Eppler for two hours and reviewing

7    his medical records, concluded that "Mr. Eppler is disabled by fatigue, daytime somnolence,

8    and cognitive impairment that are the direct result of treatment-resistant and severe obstructive

9    sleep apnea" (EA 699).  It was Dr. Lewis's professional opinion that "Mr. Eppler is unable to

10   perform all the material and substantial duties of his regular occupation" (EA 697).

11   Mr. Eppler's counsel also forwarded a copy of a cover letter to Hartford, which purported to

12   include a copy of Dr. Lewis's report.  The cover letter was dated August 2, 2007 (Fannon Decl.

13   ¶ 2, Exh. 3 and 4).  There is also a factual dispute as to whether the August 2 letter was ever

14   sent.

15     Defendants moved for summary judgment on the grounds that Mr. Eppler had failed to

16   exhaust his judicial remedies and, in the alternative, requested the opportunity to conduct an

17   appeal review of Mr. Eppler's file.  After a hearing on defendants' motion, this Court held that

18   Hartford should have treated Mr. Eppler's October 3 letter as an appeal once the appeal period

19   expired.  The matter was remanded to Hartford to conduct its administrative review of

20   Mr. Eppler's claim, and Hartford was instructed to consider Dr. Lewis's letter during its review

21   process.  Due to Mr. Eppler's failure to point to any specific documents in his letter to Hartford,

22   Hartford was not required to produce or review any additional material.

23     Hartford transferred Mr. Eppler's file to its Appeals Unit, where Senior Appeals

24   Specialist Christopher Davis was assigned to review it.  Mr. Davis, in turn, referred the file to a

25   third-party vendor, University Disability Consortium (UDC), "to have a sleep specialist review

26   the file and report on plaintiff's functionality as of April 2006 and continuing to the date of

27   review" (Br. 12).  UDC assigned the file to Dr. Andrew Filderman, who specializes in sleep

28   medicine and pulmonary medicine.  Dr. Filderman reviewed Mr. Eppler's medical records and

United States District Court

For the Northern District of California

1   Dr. Lewis's report and spoke with Dr. Lewis on the phone.  "Dr. Filderman agreed with

2   Dr. Lewis's observation that additional testing by post-surgery sleep studies would have been

3   helpful, but these were not done.  If a condition other than sleep apnea were operating to cause

4   plaintiffs' reported symptoms," Dr. Filderman noted, "the evidence for such a condition was not

5   contained in the file" (*id*. at 13).  Dr. Filderman's conclusion was that Mr. Eppler "should be

6   able to perform a full time position although may require periods of rest due to mild sleepiness"

7   (EA 995).  In a letter dated June 5, 2008, defendants upheld their original claim determination

8   and terminated Mr. Eppler's benefits.

9        Defendants now move again for summary judgment pursuant to FRCP 56.  They also

10  move to strike a letter written by Dr. Lewis and submitted by Mr. Eppler's attorney in

11  conjunction with his motion opposing summary judgment.  According to defendants, that letter,

12  which is dated July 16, 2008, is both irrelevant and outside the administrative record.

13                              **ANALYSIS**

14       Summary judgment is granted when "the pleadings, depositions, answers to

15  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

16  genuine issue as to any material fact and that the moving party is entitled to judgment as a

17  matter of law."  FRCP 56(c).  A district court must determine, viewing the evidence in the light

18  most favorable to the nonmoving party, whether there is any genuine issue of material fact.

19  *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007).  A genuine issue

20  of fact is one that could reasonably be resolved, based on the factual record, in favor of either

21  party.  A dispute is "material" only if it could affect the outcome of the suit under the governing

22  law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).[1]

23       The moving party "has both the initial burden of production and the ultimate burden of

24  persuasion on a motion for summary judgment."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz

25  Cos., Inc.*, 210 F. 3d 1099, 1102 (9th Cir. 2000).  When the moving party meets its initial

26  burden, the burden then shifts to the party opposing judgment to "go beyond the pleadings and

27  by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file,

28

_____

[1] Unless indicated otherwise, internal citations are omitted from all quoted authorities in this order.

1    designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*,

2    477 U. S. 317, 324 (1986).

3        **1.    STANDARD OF REVIEW.**

4        The proper standard of review for Hartford's claim determination is abuse of discretion.

5    "The plan language is the starting point for addressing the standard of review for denial of

6    benefits under ERISA.  In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), the

7    Supreme Court held that review is *de novo* unless the plan confers discretionary authority upon

8    the plan administrator.  If discretionary authority is conferred, the administrator's decision is

9    reviewed under the abuse of discretion standard." *Walker v. American Home Shield Long Term*

10    *Disability Plan*, 180 F.3d 1065, 1068 (9th Cir. 1999).

11        The group benefit plan issued by Hartford for Minnesota Methane LLC explicitly gives

12    Hartford, the plan administrator, the discretion to make claim determinations.  Under the section

13    entitled, "General Provisions," the plan states, "Who interprets policy terms and conditions?

14    We [Hartford] have full discretion and authority to determine eligibility for benefits and to

15    construe and interpret all terms and provisions of the Group Insurance Policy" (E 550).

16    This order therefore employs the abuse-of-discretion standard.

17        Plaintiff argues that this is not the correct standard.  He claims that the Certificate of

18    Insurance, which contains the discretionary language quoted above, is not part of the actual

19    ERISA plan.  Not so.  The certificate *is* part of the plan at issue, and it expressly says so.

20    On one of the title pages, the certificate provides, "The terms of the Policy which affect an

21    employee's insurance are contained in the following pages.  This Certificate of Insurance and

22    the following pages will become Your Booklet-certificate.  This Booklet-certificate is a part of

23    the Policy.  This Booklet-certificate replaces any other which We may have issued to the

24    Participant Employer to give to You under the Policy specified herein" (E 543).

25        Plaintiff further argues that defendants have failed to proffer a Summary Plan

26    Description ("SPD"), the terms of which would prevail over the Certificate of Insurance if the

27    terms were more favorable to the insured.  "Courts will generally bind ERISA defendants to the

28    more employee-favorable of two conflicting documents — even if one is erroneous."

1    *Banuelos v. Constr. Laborers' Trust Funds*, 382 F.3d 897, 904 (9th Cir. 2004). It is only in

2    plaintiff's opposition briefs, however, that he claims that he does not have the SPD. Hartford

3    had written a letter dated October 23, 2006, directing plaintiff's counsel to seek additional plan

4    documents from the policyholder, Minnesota Methane (E 133). There is no evidence that

5    plaintiff requested or did not receive the SPD (even after defendants pointed this out in their

6    reply memorandum for the earlier summary-judgment motion in January 2008). Nor does

7    plaintiff provide any evidence that the SPD has more favorable terms; he merely says that the

8    SPD would take precedence if its terms were more favorable to him. Speculations in briefs do

9    not constitute evidence. Accordingly, this order finds that plaintiff has failed to show why the

10   abuse-of-discretion standard should not apply.

11        The fact that Hartford here is both the claims administrator and the payor creates

12   a conflict of interest, which must be factored into the abuse-of-discretion analysis.

13   In *Metropolitan Life Insurance Co. v. Glenn*, __ U.S. __, 128 S.Ct. 2343, 2346 (2008), the

14   Supreme Court held that when the same entity determines eligibility for benefits and pays those

15   benefits out of its own pocket, a conflict of interest is created and "a reviewing court should

16   consider that conflict as a factor in determining whether the plan administrator has abused its

17   discretion in denying benefits." The Court provided the following guidance for how a

18   reviewing court should factor the conflict of interest into its analysis:

> We turn to the question of how the conflict we have just identified
> should be taken into account on judicial review of a discretionary
> benefit determination. In doing so, we elucidate what this Court
> set forth in *Firestone*, namely, that a conflict should be weighed as
> a factor in determining whether there is an abuse of discretion.
> We do not believe that *Firestone's* statement implies a change in
> the standard of review, say, from deferential to de novo review . . .
> Neither do we believe it necessary or desirable for courts to create
> special burden-of-proof rules, or other special procedural
> evidentiary rules, focused narrowly upon the evaluator/payor
> conflict . . . We believe that Firestone means what the word
> "factor" implies, namely, that when judges review the lawfulness
> of benefit denials, they will often take account of several different
> considerations of which a conflict of interest is one.

*Id*. at 2350. In sum, this order reviews Hartford's denial of benefits for abuse of discretion, of

which Hartford's conflict of interest is one factor.

United States District Court

For the Northern District of California

1       Turning to the question of what constitutes abuse of discretion, the Ninth Circuit has

2   held that "[a]n ERISA administrator abuses its discretion only if it (1) renders a decision

3   without explanation, (2) construes provisions of the plan in a way that conflicts with the plain

4   language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bell*, 410 F.3d

5   1173, 1178 (9th Cir. 2005). "A finding is clearly erroneous when although there is evidence to

6   support it, the reviewing court, after considering all the evidence, is left with the definite and

7   firm conviction that a mistake has been committed." *Ibid*. The decision of an ERISA plan

8   administrator will be upheld "if it is based upon a reasonable interpretation of the plan's terms

9   and was made in good faith." *Ibid.*

10       **2.    HARTFORD'S EXERCISE OF DISCRETION.**

11       Hartford's conclusion that plaintiff was capable of performing full-time sedentary to

12   light work may not have been the *only* possible conclusion to be drawn from the evidence, but it

13   was a reasonable one. There exists no genuine issue of material fact as to whether Hartford

14   abused its discretion in its review of plaintiff's file, and summary judgment must be granted in

15   defendants' favor. Plaintiff has reported symptoms that neither Dr. Lewis nor Dr. Filderman

16   was fully able to explain, and both experts noted that their analysis would have benefitted from

17   additional sleep test results. Unfortunately, during the relevant time period, such sleep tests

18   were not administered. Hartford properly relied only on the information available in the

19   administrative record at the time of its review, which included the contents of plaintiff's file up

20   to April 2006 and Dr. Lewis's subsequent report. Those documents do not support a finding

21   that Hartford's determination was unreasonable.

22       This order must begin by addressing the admissibility of Exhibit A to plaintiff's

23   opposition motion, which defendants have moved to strike. That exhibit is a letter dated

24   July 16, 2008, from Dr. Lewis to Mr. Baum, plaintiff's attorney. The letter, which comments

25   on Dr. Filderman's report and on defendants' moving papers, is improper and is hereby stricken

26   from the record. As the Ninth Circuit held in *Silver v. Executive Car Leasing Long Term*

27   *Disability Plan*:

28           In general, a district court may consider only evidence within the
             administrative record at the time of the administrator's decision.

> This restriction is based on the principle that federal district courts should not function as substitute plan administrators, and that expanding the record on appeal would frustrate the goal of prompt resolution of claims by the fiduciary under the ERISA scheme.

466 F.3d 727, 732 n.2 (9th Cir. 2006). There is an exception to this rule when the district court reviews the plan administrator's decision *de novo*, but such is not the case here. The administrative record closed on June 5, 2008, when Hartford denied plaintiff's appeal. Dr. Lewis's July 16, 2008 letter was not available to the claim administrator when he conducted his review and thus cannot be considered for the purpose of determining whether the administrator abused his discretion.

Turning to the larger question at issue, plaintiff has provided no evidence that defendants (i) rendered a decision without explanation, (ii) construed provisions of the plan in a way that conflicted with the plain language of the plan, or (iii) relied on clearly erroneous findings of fact. *Boyd*, 410 F.3d at 1173. Nor has plaintiff presented any evidence that defendants' structural conflict of interest led them to abuse their discretion in reviewing his claim.

In making its initial determination, Hartford regularly obtained and reviewed plaintiff's medical records, consulted his personal physicians, interviewed him, and provided him with a detailed explanation of why they had decided to deny his LTD benefits. Mr. Eppler had been observed in surveillance videos exhibiting a level of activity that was inconsistent with the reports he had been giving to his doctors and to Hartford. More importantly, plaintiff's own physicians reported to Hartford that plaintiff's sleep condition had improved, and Dr. Gannon, on behalf of all three of plaintiff's primary physicians, concurred in Hartford's assessment that Mr. Eppler could return to a full-time sedentary to light occupation. The initial determination was not unreasonable.

On appeal, Hartford was specifically ordered to consider the report of Dr. Lewis, and it did. Dr. Filderman submitted an addendum specifically addressing Dr. Lewis's report. In that addendum, Dr. Filderman agreed with Dr. Lewis's hypothesis that plaintiff may be suffering

from a second condition in addition to sleep apnea but pointed out that there was insufficient

evidence on the record to establish what that condition might be:

> It is certainly possible that Mr. Eppler has a second sleep abnormality (e.g. idiopathic hypersomnolence/narcolepsy) or unrelated CNS process which would result in his current symptoms. An MSLT in 2003 while on BiPAP and Adderall was highly abnormal and suggestive of idiopathic hypersomnolence. This by itself could result in significantly diminished functionality. However, we do not have a more recent study to confirm these findings and a second sleep disorder has not been established within reasonable medical certainty. Alternatively, the claimant may have an ongoing neurologic disorder (e.g. dementia) or metabolic abnormality separate from the sleep disturbance which would explain his symptoms.

(EA 995). Hartford had a separate claim reviewer and medical specialist review plaintiff's file

on appeal, and when it upheld its initial determination, Hartford provided plaintiff with another

detailed, written explanation of its decision.

This order has considered the conflict of interest that clearly exists as a result of

Hartford being both the plan administrator and the payor. Plaintiff has failed, however, to

provide any evidence that this conflict of interest led Hartford to abuse its discretion. In *Abatie*

*v. Alta Health & Life Insurance Co.*, 458 F.3d 955, 959 (9th Cir. 2006), the Ninth Circuit noted:

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.[2]

Though the party moving for summary judgment has the ultimate burden of persuasion, the

nonmoving party has the burden of coming forward with specific facts that militate against a

finding of summary judgment. Plaintiff has not done so here. Plaintiff's Rule 56(f) request to

submit additional evidence regarding defendants' conflict of interest, discussed at more length

---

[2] Though *Abatie* was decided before *Metropolitan Life Insurance Co. v. Glenn*, the Ninth Circuit noted that *Abatie* was consistent with *Glenn* in *Wilcox v. Wells Fargo & Co. Long Term Disability Plan*, 2008 WL 2873735, at *1 (9th Cir. 2008).

11

United States District Court

For the Northern District of California

below, is insufficient.  The request does not lay out any specific facts that plaintiff believes might be revealed by further discovery.  In short, plaintiff has given this Court no reason to believe that Hartford made its determination in bad faith.

Rather than directly addressing the conflict of interest, plaintiff discusses three other ways in which he believes Hartford abused its discretion.

*First*, plaintiff lays out the procedural violations he believed defendants committed in their review of his file on appeal.  With respect to plaintiff's complaint that Hartford did not conduct an independent medical examination as part of its review, this Court was clear in its February 2008 order that Hartford was required only to review the existing administrative record and Dr. Lewis's report.  Furthermore, as Hartford points out, a medical examination at this stage would not address whether plaintiff satisfied the relevant disability definition as of April 2006, when his benefits were terminated.  It is that determination that is under review here.

With respect to plaintiff's claim that defendants should have produced to his attorney whatever information they had generated as of April 2008, defendants state that they had not yet produced anything for plaintiff's attorney to comment on at that point.  In any event, defendants are correct that plaintiff had no automatic right to see and comment on the information generated upon appeal.  *Silver*, 466 F.3d at 731–32 n.2.

With respect to the fact that Hartford did not complete its review of plaintiff's claim within the 90 days required by ERISA, that delay is certainly unfortunate, but plaintiff has not demonstrated that he suffered any harm as a result of it.  In *Abatie*, the Ninth Circuit addressed "how a court is to review an ERISA plan administrator's decision when the procedure that produced the decision did not follow all statutory requirements."  458 F.3d at 959.  As the court concluded:

> when a decision by an administrator utterly fails to follow applicable procedures, the administrator is not, in fact, exercising discretionary powers under the plan, and its decision should be subject to de novo review.  Lesser irregularities . . . do not remove the decision from abuse of discretion review, but rather should be factored into the calculus of whether the administrator abused its discretion.

*Ibid.* Plaintiff does not argue, nor does this order find, that the procedural irregularities at issue here constitute the kinds of "wholesale and flagrant violations" that might require *de novo* review. *Id.* at 971–72.

*Second*, plaintiff lays out a bullet-pointed list of ways in which a claims fiduciary might abuse its discretion (Opp. 12). Plaintiff does not tie any of these potential violations back to the facts of this case — he merely includes one sentence at the end of the list reading, "Here, The Hartford did all of those things" (*ibid.*). Defendants met their initial burden of production in their motion for summary judgment, and Mr. Eppler then had the burden to "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U. S. at 324. Plaintiff's vague, blanket statement that "Hartford did all of those things" will not suffice to generate a genuine issue of material fact.

*Third*, plaintiff suggests — largely through Dr. Lewis's report — that Hartford's initial determination focused too heavily on his self-reported physical limitations and not enough on his cognitive limitations. Dr. Lewis notes, for example:

> No speculation is necessary as to what Dr. Gannon meant when he signed the letter from Nurse Case Manager Wilkins saying that Mr. Eppler could perform light work. When I spoke with Dr. Gannon, he was unambiguous in stating that his endorsement of the pre-written statement pertained only to Mr. Eppler's physical ability to perform activity, that he had not assessed and would not have been able to comment on the status of Mr. Eppler's cognitive function. The fact that Dr. Gannon signed the letter from Hartford does not, therefore, constitute any evidence whatsoever about Mr. Eppler's sleep or daytime fatigue, somnolence, and cognitive impairment.

(EA 698–99). Dr. Filderman's review on appeal, however, focused almost entirely on Mr. Eppler's sleep disorder and resulting cognitive functioning. Dr. Filderman did not dispute Dr. Lewis's observations of plaintiff, but Dr. Filderman noted that there was no corroborating information from any of Mr. Eppler's treating physicians to support Dr. Lewis's hypotheses. For his part, Dr. Filderman believed "that Mr. Eppler's level of obstructive sleep apnea or other polysomnographic results would not explain the cognitive abnormalities or level of sleepiness" that plaintiff had been reporting (EA 996). If another condition was responsible for plaintiff's

United States District Court

For the Northern District of California

cognitive impairments, Dr. Filderman concluded, there was no evidence on file to indicate what that condition might be. Again, though Dr. Filderman agreed that additional test results would have been useful, this Court had instructed Hartford that it need not go beyond the existing administrative record in its review on appeal.

In short, defendants' conclusion that Mr. Eppler's sleep apnea had improved to a point where he no longer qualified for LTD benefits as of April 2006 was supported by substantial evidence, including improved sleep test results and the testimony of plaintiff's own physicians. While Dr. Lewis drew a different conclusion from the evidence than Dr. Filderman and plaintiff's physicians did, "[t]he mere fact that the plan administrator's decision is directly contrary to some evidence in the record does not show that the decision is clearly erroneous." *Snow v. Standard Life Ins. Co.*, 87 F.3d 327, 331 (9th Cir. 1996). The clearly erroneous standard "does not permit the overturning of a decision where there is substantial evidence to support the decision, that is, where there is relevant evidence that reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Id*. at 331–32.

### 3. PLAINTIFF'S REQUEST FOR FURTHER DISCOVERY UNDER FRCP 56(F).

Though plaintiff maintains that further evidence need not be considered in order for summary judgment to be denied, he does request further discovery pursuant to FRCP 56(f) in the event that the Court deems the record insufficient to determine how defendants' conflict of interest might have affected their determination of his claim. A party requesting further discovery under FRCP 56(f) "must show: (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Family Home and Finance Center, Inc. v. Fed. Home Loan Mtg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008). Plaintiff has met none of these requirements. He did not present any specific facts he hoped to obtain from further discovery, nor did he demonstrate how those facts might be essential to opposing summary judgment. The request is therefore denied.

United States District Court

For the Northern District of California

1    This case is distinguishable from *Wilcox*, in which the Ninth Circuit overturned the

2    district court's denial of the plaintiff's request to conduct further discovery in order to obtain

3    and present evidence related to the defendants' conflict of interest.  There, the district court had

4    followed the Ninth Circuit's opinion in *Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317

5    (9th Cir. 1995), which required the plaintiff to establish a "serious" conflict of interest in order

6    to invoke *de novo* review.  The Ninth Circuit subsequently overruled *Atwood* in *Abatie* and thus

7    remanded *Wilcox* and instructed the district court to reconsider its decision in the light of both

8    *Abatie* and the Supreme Court's decision in *Glenn*.  This order has considered both of those

9    opinions, as noted above, but plaintiff simply has not met his obligations under Rule 56(f).

10    He has given the Court no reason to believe that there exists evidence outside of the

11    administrative record that might support a finding that defendants' conflict of interest should be

12    given any more weight than it has already been given here.

**CONCLUSION**

14    For the foregoing reasons, defendants' motion for summary judgment is **GRANTED**.

16    **IT IS SO ORDERED.**

18    Dated:  August 7, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE